**Jasper R. VINES et al., Plaintiffs,**

**v.**

**Thomasina M. HODGES et al., Defendants.**

**Civ. A. No. 75–1211.**

United States District Court, District of Columbia, Civil Division.

Oct. 13, 1976.

---

Al J. Daniel, Jr., Washington, D.C., for plaintiffs.

Herbert B. Dixon, Jr., Washington, D.C., for defendants.

## MEMORANDUM

GASCH, District Judge.

In this action plaintiffs seek damages and equitable relief based on defendants' alleged violations of certain federal and District of Columbia consumer protection statutes. Plaintiffs claim that defendants violated these statutes by selling them a used Cadillac at a price that allegedly included a considerable finance charge without making the statutorily required disclosures of credit terms, and without complying with statutorily mandated procedures. Plaintiffs also claim that defendants wrongfully repossessed the automobile and illegally accelerated the balance due thereon. Defendants have counterclaimed for the unpaid balance on the auto purchase contract.

The matter came on for hearing on plaintiffs' motion for summary judgment as to Counts I, II, IV, VI, and VIII of the Amended Complaint,[1] and for dismissal of defendants' counterclaim for the balance due on the purchase price of the car. Count I of the Amended Complaint seeks statutory damages pursuant to the Truth in Lending Act (TILA), 15 U.S.C. § 1601 *et seq.* (1973), and Regulation Z promulgated thereunder, 12 C.F.R. Part 226. Count II requests rescission of the contract, restitution of amounts paid, and punitive damages based on violations of D.C.Code § 40–901 *et seq.* (1973) and District of Columbia Regulations, 5AA D.C.R.R. § 1.1. *et seq.* The principal violations alleged in Count II include the defendants' failure to certify the truth of the matters set forth in the contract, failure to notify the buyers of their statutory rights, and the lack of signature of a licensed dealer on the contract. Counts IV and VI seek actual, statutory and punitive damages for wrongful repossession and

---

1. The three counts not involved in this motion include Count II, alleging breach of express warranty, Count V seeking restitution on a theory of justified revocation of acceptance, and Count VII which seeks refund of the $60.00 paid as an insurance premium.

acceleration, respectively, prior to the expiration of the thirty-day grace period required by D.C.Code § 28–3812(b)(1) and (d) (1973), and 5AA D.C.R.R. §§ 5.1, 3.10 (1970). Count VIII requests a declaratory judgment that because of defendants' aforementioned violations of the statutes governing repossession, notice, and resale plaintiffs owe nothing on defendants' counterclaim for a deficiency balance on the contract price. Having considered the memoranda, exhibits, affidavits, and the oral arguments advanced by counsel, the Court has determined that plaintiffs are entitled to partial summary judgment as to liability on all five counts involved here, and as to certain elements of damages.

## SUMMARY OF UNDISPUTED MATERIAL FACTS

■ The plaintiffs' Statement of Material Facts Not in Dispute, plus the affidavits and exhibits submitted in support thereof, establish the following as the undisputed material facts.[2] On July 25, 1974, plaintiffs Jasper and Madeline Vines went to the business premises of defendants Thomasina and Kenneth Hodges, who were engaged in the sale of used cars under the trade name of Crest Auto Sales and Service, to purchase a used car. Thomasina Hodges owns the business, which Kenneth Hodges manages. Plaintiffs selected a used 1967 Cadillac, 4-door sedan DeVille. Mr. Vines paid a $100 deposit and signed a Purchase Agreement which obligated him to buy the car for $1695.00, to be paid in 14 bi-weekly payments. At that time the Official Used Car Guide of the National Automobile Dealers Association (NADA) set forth a $975 figure as the average retail price of a 1967 Cadillac 4-door sedan DeVille.

On the date of purchase plaintiffs also signed a Car Order and Bill of Sale and a separate security agreement. The blanks for payment terms and extra charges were not all filled in at the time the documents

were signed. Plaintiffs also agreed on July 25 to make an additional $500 down payment the next day, and to pay an additional $158.75 for license plates and tax, and $60.00 for insurance. Both additional charges were payable 17 days later, and plaintiffs did pay those charges on or about August 10. The Car Order and Bill of Sale bore a stamped notation: "sold as is—100% inspection only." The latter phrase meant that defendants would perform any repairs necessary for the car to pass D.C. inspection.

On July 26, 1974, the day after purchase of the car, Mrs. Vines returned to Crest Auto Sales, paid the additional $500 down payment, and took delivery of the car. Plaintiffs received the original of the Purchase Agreement and Deposit Receipt on July 25, 1974, and a copy of the Car Order and Bill of Sale, the Dealer's Special Use Certificate for the vehicle, and an installment booklet on July 26, 1974. Plaintiffs did not sign any other contractual or disclosure documents, and they received copies of no documents.

On August 21, 1974, plaintiffs' Cadillac broke down near Richmond, Virginia. Plaintiffs left the car in Fredericksburg, and then telephoned Crest Auto. They explained the situation to defendant Kenneth Hodges, who agreed to have the car towed back to Crest Auto. He did have the car towed back, but then on August 26 attempted to impose on plaintiffs the responsibility for the breakdown of the car and the cost of repairs.

Because of the breakdown of the car and the dispute over liability for the cost of repairs, plaintiffs refused to make the first regularly scheduled payment on the car on August 23. On September 17, 1974, prior to the expiration of the 30-day grace period for late payment established by D.C. law, defendant Thomasina Hodges wrote plaintiffs, advising them that the Cadillac had

2. Defendants have supplied no statement of genuine issues, no affidavits or exhibits, and have not even pointed to any interrogatory answers to show the existence of any genuine factual issue. Therefore, in accordance with

Federal Rule 56 and our local rule 1–9(g) plaintiffs' statement of material facts, insofar as it is summarized in the text, will be deemed admitted by defendants.

been repossessed and demanding the accelerated balance of $1100 plus costs. On April 8, 1975, defendants sold the car to a third party for $1295.00.

On July 25 and 26, 1974, when defendants sold the used Cadillac to plaintiffs, defendant Kenneth Hodges and his employee John Treer were licensed as auto salesmen but not as dealers. Neither was authorized to sign invoices or retail installment contracts on behalf of defendant Thomasina Hodges, who was licensed as a car dealer.

## MERITS OF THE MOTION

A. *The Claim for Damages Pursuant to the Truth in Lending Act.*

Section 121 of the Truth in Lending Act, 15 U.S.C.A. § 1631, requires creditors engaged in consumer credit transactions to disclose to the customer certain credit information prior to the making of a down payment, in accordance with regulations promulgated by the Federal Reserve Board. Failure to make disclosures entitles the customer to whom the disclosures should have been made to a civil penalty equal to double the amount of the finance charge imposed, but not less than $100 nor more than $1000, plus costs and a reasonable attorney's fee. 15 U.S.C. § 1640. In this case defendants admit that they failed to comply fully with the disclosure provisions applicable to the sale of the used Cadillac to plaintiffs. Thus the two basic issues relevant to the TILA claim are whether the sale was subject to the TILA disclosure provisions, and the amount of damages to be awarded.

Defendants herein do not explicitly deny that the disclosure provisions of TILA applied to the transaction in question. Instead they contend that no finance charge was imposed and, indeed, that as a matter of policy defendants "never impose a finance charge."[3] Since these objections might be understood as an argument against treating defendants as "creditors," on the auto sale as a "consumer credit" transaction as those terms are used in the coverage provisions of TILA, the rationale for applying TILA to this transaction should be explained.

The disclosure provisions of TILA apply to "each creditor" who extends "consumer credit."[4] The Act defines "creditor" as "creditors who regularly extend . . . credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required."[5] "Credit" is defined as "The right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment."[6] Regulation Z elaborates on this by including within the definition of credit the right to "purchase property . . . and defer payment therefor."[7] "Consumer credit" is:

> credit offered or extended to a natural person, in which the . . . property . . . which is the subject of the transaction is primarily for personal, family, household, or agricultural purposes and for which either a finance charge is or may be imposed or which pursuant to an agreement, is or may be payable in more than four installments.[8]

The auto sale at issue here clearly amounted to a consumer credit transaction within the definition set forth *supra*, even if, as defendants claim, no finance charge was imposed. Defendants granted plaintiffs the right to purchase the used car and defer payment of the price. Thus the sale was a credit transaction. Moreover the deferral of payment amounted to a *consumer* credit transaction since plaintiffs are natural persons who purchased the car primarily for personal or family use, and the price was made payable in more than four deferred installments. Finally, the uncontroverted evidence of record demonstrates that

---

3. See Defendants' Opposition, p. 3.

4. 15 U.S.C. § 1631.

5. 15 U.S.C. § 1602(f) (Supp. IV, 1974); see also 12 C.F.R. § 226.2(m) (1975).

6. 15 U.S.C. § 1602(e) (1970).

7. 12 C.F.R. § 226.2(*l*) (1975).

8. 12 C.F.R. § 226.2(k) (1975).

defendants regularly extend consumer credit payable in more than four installments.[9] The credit extended was other than open end.[10] Therefore defendants are creditors within the meaning of TILA and were obligated to comply with the disclosure provisions of the Act when making the used car sale at issue here.

■ The disclosure requirements applicable to this transaction are set forth in 15 U.S.C. § 1638 and 12 C.F.R. § 226.8(a), (b) and (c). Defendants admit, and the record reflects, that they violated those requirements in the following respects: (1) not all required disclosures were made prior to consummation of the contract;[11] (2) not all required disclosures were made on a single document;[12] (3) the number, amount and due dates of payments were not clearly disclosed;[13] (4) the type of security interest retained by defendants, and the property subject to the security interest were not clearly described or identified;[14] (5) the disclosures were not made in the terminology prescribed by the Act and Regulation Z in that defendants used the term "principal balance" rather than "unpaid balance," "total cash price Balance" instead of "unpaid balance of cash price" and "cash sale price of Vehicle and Equipment" instead of "cash price";[15] (6) the down payment was not properly itemized as a cash down payment, and the amount of the down payment was overstated by including the amount of the governmental charges in the amount of the total down payment.[16]

■ Aside from the several admitted violations, the facts demonstrate the occur-

**9.** Defendants use printed form car orders, contracts and payment books providing for installment payments. See plaintiffs' exhibits 3, 4, 5. Defendant Thomasina Hodges on various occasions notified the D. C. Department of Economic Development of the names of persons authorized to execute conditional sales contracts on her behalf. See plaintiffs' exhibits 15(a), (b), (c), (d). These notification letters plus the sample conditional sales contract and car order forms that Mrs. Hodges submitted to the Department clearly reflect an intention to offer deferred payment terms on a regular basis. See plaintiffs' exhibits 15(a)–(g).

**10.** 12 C.F.R. § 226.2(r) (1975).

**11.** See 15 U.S.C. § 1638(b) (1970); 12 C.F.R. § 226.8(a) (1975). Plaintiff Jasper Vines became contractually obligated to purchase the automobile on July 25, 1974, at the time he paid defendants $100.00 and signed Crest Auto's purchase agreement and deposit receipt which stated that he agreed to purchase the car and that his deposit would be forfeited if he failed to fulfill the agreement within 10 days (plaintiffs' exhibit 1). Neither at that time nor at any later time did defendants give plaintiffs a copy of a single instrument or statement on which all the required disclosures were made, as required by 12 C.F.R. § 226.8(a). Defendants did not give plaintiffs copies of any of the disclosure documents until July 26, 1974. See Vines Affidavit.

**12.** See 12 C.F.R. § 226.8(a) (1975). In order to know their full financial obligation, plaintiffs were required to examine five separate documents, the Purchase Agreement and Deposit Receipt, the Car Order and Bill of Sale, Security Agreement, a separate statement requiring an insurance payment of $60.00 within 17 days, and another requiring payment of the governmental charges within 17 days (plaintiffs' exhibits 1, 3, 4, 6, 7). The car order does not mention that the $158.75 governmental charges were payable 17 days later, as reflected on exhibits 6 and 7, and the car order makes no mention at all of the $60.00 insurance premium.

**13.** See 12 C.F.R. § 226.8(b)(3) (1973). The car order states that the terms of payment of the time price balance were:

> 13 bi-weekly payments of $78.57. Each start on August 23, 1974 day of each month, and a final payment of $78.59 ending February 21, 1975.

The obscurity of this provision violates the requirement of 12 C.F.R. § 226.6(a) that all required disclosures "shall be made clearly . . . . ."

**14.** 15 U.S.C. § 1638 (1970); 12 C.F.R. § 226.8(b)(5) (1975).

**15.** 12 C.F.R. § 226.8(c)(1), (c)(3), (c)(5) (1975).

**16.** 12 C.F.R. § 226.8(c)(2). As indicated by plaintiffs' affidavit, plaintiffs' exhibit 14, Mr. Vines paid defendants $100 on July 25, 1974, and Mrs. Vines paid $500 on July 26, 1974, a total of $600. Yet the car order and Bill of Sale, plaintiffs' exhibit 3, reflects $753.75 as the amount of the total down payment, although the $753.75 is $5.00 short of the sum of the $600.00 paid as a cash down payment plus the $158.75 paid approximately three weeks later for tax and tags. Defendants entered the word "NONE" in the line for "Cash Down Payment."

rence, as a matter of law, of several additional violations. First, the various documents connected with the sale all identified Crest Auto Sales and Service as the dealer or secured party. In fact Crest Auto is not a legal entity and is simply a trade name for Thomasina Hodges.[17] In the Court's opinion, the defendants' failure to set forth Thomasina Hodges' name on the disclosure documents violated the provision of Regulation Z which requires that the disclosure statement "identify the creditor."[18] This interpretation accords with the purposes of the Act, since knowledge solely of the Crest Auto trade name would be useless to any dissatisfied customer seeking legal redress against the selling entity.

Whether additional TILA violations occurred hinges on whether a finance charge was imposed. If a finance charge was imposed, then many additional violations of the Act occurred, and the measure of damages will be affected. The principal potential ingredient of the finance charge, as contended for by plaintiffs, is the difference between the $1695 price Crest Auto charged for the used Cadillac, and the $975 price listed in the NADA Official Used Car Guide as the average retail price of that model car at the time of purchase. Plaintiffs also urge the Court to include the fees for insurance and for license tags and tax in the finance charge. Defendants, on the other hand, contend that no finance charge was imposed in this case and that they never impose a finance charge on any of their installment sales.[19] After due consideration of plaintiffs' contentions, the Court believes that only the $60.00 fee for insurance and the $158.75 charge for governmental charges should properly be treated as part of a finance charge without further proof.

If upon the trial of this matter plaintiffs prove the market value of the Cadillac in question as of the time when they purchased it, then the difference between that amount and the cash price charged will also be includable in the finance charge.

■ Regulation Z specifically provides for inclusion in the finance charge of

(6) Charges or premiums for insurance written in connection with any credit transaction against loss of or damage to property . . ., unless a clear, conspicuous, and specific statement in writing is furnished by the creditor setting forth the cost of the insurance if obtained from or through the creditor and stating that the customer may choose the person through which the insurance is to be obtained (footnotes omitted).[20]

The only clear, conspicuous and specific statement given by defendants with respect to loss insurance was a sentence in bold-faced letters, "Purchaser Must Carry Physical Damage Insurance With Crest Auto as the Lost [sic] Payee," which was stamped on the security agreement.[21] Plaintiffs also received a statement setting forth the balance due Crest Auto on the insurance premium and the due date of the premium.[22] Neither of these documents, however, nor the two documents read together, contains the required statement "that the customer may choose the person through which the insurance is to be obtained." Accordingly, the disclosures relevant to the insurance charge did not satisfy the Regulation Z requirements for exclusion as set forth *supra,* and the $60.00 should have been disclosed as part of the finance charge.[23]

■ The Court also agrees with plaintiffs that the $158.75 charged for license tags and tax should be treated as part of the

---

17. Plaintiffs' Exhibit 15(a).

18. See 12 C.F.R. § 226.8(a) (1975); *Welmaker v. W. T. Grant Co.,* 365 F.Supp. 531, 539–40 (N.D.Ga.1972) (identification of creditor held inadequate where Georgia store was identified as "store 370 of W. T. Grant," with only W. T. Grant's New York address given).

19. Defendants' Answer to Plaintiffs' Interrogatory No. 17.

20. 15 U.S.C. § 1605(c) (1970); 12 C.F.R. § 226.-4(a)(6) (1975).

21. Plaintiffs' Exhibit 4.

22. Plaintiffs' Exhibit 7. Plaintiffs paid the balance due on August 10, 1974. See *id.*

23. 12 C.F.R. § 226.8(c)(8)(i) (1975).

**1300**

finance charge for the reason that defendants did not deliver a properly itemized disclosure of those charges prior to consummation of the contract. Regulation Z exempts charges for tax, license, title, and registration fees from inclusion in the finance charge *only if* those charges are "itemized and disclosed to the customer." [24] Here, however, the exemption does not apply because defendants did not itemize these charges on the Car Order and Bill of Sale in the manner required by Regulation Z,[25] and did not provide plaintiffs with a copy of the Car Order and Bill of Sale before consummating the contract on July 25, 1974, in compliance with the general rule governing the time for making disclosures.[26]

Plaintiffs urge the Court to include as part of the finance charge the difference between the $1695 price that defendants charged for the used Cadillac in question and the $975 figure listed by the National Automobile Dealers Association booklet as the average retail price for a Cadillac of that year and model.[27] Plaintiffs contend that in view of the large difference between the two prices some part of the $1695 charged plaintiffs must have been a "buried finance charge." The Court agrees that the difference, if any there was, between true market value and the price charged for the used Cadillac should have been disclosed at the time of sale as a finance charge, and should now be included in the finance charge for purposes of determining the amount of the statutory penalty.[28] Plaintiffs have introduced no evidence as to the true market value of the Cadillac, however, so the amount of the buried finance charge cannot be computed at this time. The NADA average retail value of similar Cadillacs, on which plaintiffs rely, does not, however, substitute for proof of the true market value of this particular car.

It is not inconceivable that this car could have been worth $700 more than average, depending on its appearance and state repair of the car. In this respect this case is factually distinguishable from *Killings v. Jeff's Motors, Inc.*[29] in which the Court computed the buried finance charge as the difference between the listed average retail price for "extra clean" cars of the appropriate make, and the price charged by the seller. In *Jeff's Motors* the Court emphasized that the parties had stipulated to the highest figure customarily charged in the area for cars of that type. Here, however, the record contains no such stipulation. Thus the questions whether the price contained a buried finance charge, and if so, how much, remain for trial.

Several additional findings of TILA violations flow from the determination that the insurance and governmental charges in this case should have been treated as part of the finance charge. Most obvious of these is the defendants' failure to disclose the amount of the finance charge.[30] Others include the failure to disclose the annual percentage rate of the finance charge,[31] failure to identify the method of rebate to be used upon prepayment in full,[32] and failure to disclose the "deferred payment price," which amounts to the sum of the cash price, all other charges, and the finance charge.[33] Even assuming that the $1695.00 price of the Cadillac did not in-

---

**24.** 15 U.S.C. § 1605(d); 12 C.F.R. § 226.-4(b)(3)(4) (1975).

**25.** 12 C.F.R. § 226.8(c)(4) (1975); Plaintiffs' Exhibit 3(a).

**26.** 12 C.F.R. § 226.8(a) (1975); see note 11 *supra* and accompanying text.

**27.** See Plaintiffs' Exhibit 17(b).

**28.** See *Killings v. Jeff's Motors, Inc.*, 490 F.2d 865, 866 (5th Cir. 1974).

**29.** *Id.*

**30.** 12 C.F.R. § 226.8(c)(8)(i) (1975).

**31.** 12 C.F.R. § 226.8(b)(2) (1975).

**32.** 12 C.F.R. § 226.8(b)(7) (1975). A finance charge rebate is required in the event of prepayment by D.C. law. See 5AA D.C.R.R. § 4.2 (1970).

**33.** 12 C.F.R. § 226.8(c)(8)(ii) (1975).

clude any "buried finance charge," the finance should have been disclosed as the sum of the insurance and governmental charges.

For violation of the disclosure provisions of the Truth in Lending Act, the Act awards to the person to whom the creditor failed to disclose, statutory damages equal to twice the amount of the finance charge imposed, with a minimum amount of $100 and a maximum of $1000, plus costs and reasonable attorney's fees.[34] Plaintiffs in this case are entitled to the statutory award, since the Court has found that defendants violated the TILA disclosure provisions. The amount of the penalty, however, cannot be computed until the amount of the buried finance charge, if any, is determined at trial. The penalty will equal twice the amount of the buried finance charge, if any, plus $437.50, which is twice the sum of the insurance and governmental charges. The total penalty is, of course, subject to the $1000 statutory maximum.

■ Contrary to the suggestion made in plaintiffs' post-hearing Supplemental Memorandum, nothing in the Act suggests that defendants should pay two statutory penalties, one to each plaintiff spouse. In fact, Regulation Z specifically provides that in a single transaction involving more than one customer, "the creditor need furnish a statement of disclosures required by this part to only one [customer]. . . ."[35] The civil liability section of the Act would apparently preclude imposition of more than one statutory penalty based on a multiple customer transaction, for the section provides for award of the statutory amount only to persons to whom a creditor failed to make *required* disclosures. Since under Regulation Z disclosures are required to be made to only one customer in a multiple customer transaction, only one customer in such a transaction should be allowed to recover under the civil liability section of the Act as a person to whom disclosures were "required" to be made. Accordingly,

plaintiffs are entitled to a partial summary judgment on Count I of their Amended Complaint, which will be limited to a judgment of defendants' liability for one statutory damage award based on the TILA violations. The amount of the award remains to be ascertained at trial. Plaintiffs are also entitled to costs plus reasonable attorney's fees.

**B.** *The Claims for Rescission and Restitution Based on the Illegality of the. Contract Under D.C. Law.*

■ In Count II of the Amended Complaint plaintiffs seek to avoid the sale transaction and recover the $818.75 paid to defendants thereunder, plus punitive damages. Plaintiffs cite as grounds for avoiding the contract the defendants' failure to "provide plaintiffs with a duplicate copy of a retail installment contract containing all matters required to be contained therein by 5AA D.C.R.R. § 1.1 et seq." The cited regulations, entitled the "D.C. Regulations on Buying, Selling and Financing of Motor Vehicles," were promulgated pursuant to the Installment Sales of Motor Vehicles Act, D.C.Code § 40–901 *et seq.* (1973). The regulations contain comprehensive and mandatory requirements for the sale of motor vehicles by dealers and require the inclusion of certain terms and information in contracts, prohibit various practices and terms, and require the licensing of dealers, salespersons, the filing of written authorization for sales personnel to sign contracts on behalf of dealers, and the bonding of dealers, *inter alia.*

Numerous violations of the D.C. Regulations are apparent on the face of plaintiffs' exhibits, and defendants acknowledge three significant violations in their Opposition to Plaintiffs' Motion. The three admitted violations include: (1) defendants' failure to give a licensed dealer's certification as to the truth of the information set forth on

---

**34.** 15 U.S.C. § 1640(a)(1), (2)(A), (3) (Supp. IV, 1974). The statute also allows for recovery of actual damages, but plaintiffs have requested only the statutory penalty.

**35.** 12 C.F.R. § 226.6(e) (1975).

the installment sales contract,[36] (2) defendants' failure to include on the face of the contract a bold-face notice to purchaser, in 14-point type, stating:

NOTICE TO PURCHASER: IT IS AGAINST THE LAW FOR THE SELLER TO PERMIT OR REQUEST YOU TO SIGN THIS DOCUMENT BEFORE ALL BLANKS ABOVE HAVE BEEN FILLED IN BY THE SELLER AND HE HAS SIGNED THIS PAPER CERTIFYING THAT THE ABOVE INFORMATION IS CORRECT;[37]

(3) imposition of a delinquency and collection charge in excess of that permitted by the D.C. Regulations.[38]

The defendants violated the Regulations in other respects as well. Their failure to itemize the $60.00 cost of the insurance premium in the Car Order and Bill of Sale amounted to a fairly minor violation,[39] but defendants also violated major provisions of the Regulations governing authorization to sign and certify installment sales contracts. The Regulations absolutely prohibit the execution of a contract or invoice by any person who has not been specifically authorized in a writing filed with the Department:

No person shall execute on behalf of any dealer, and no dealer shall permit any person to execute for or on behalf of such dealer, any invoice or retail installment contract, unless prior thereto such dealer has in writing designated such person as his authorized representative for such purpose and has filed such designation with the Deputy Chief. 5AA D.C.R.R. § 3.13 (1970).

The records of the D.C. Department of Economic Development, Office of Licenses and Permits, show that at the time the Car Order and Bill of Sale was executed by salesmen John Freer and Kenneth Hodges, neither had been authorized by defendant Thomasina M. Hodges, the dealer, to execute invoices or retail installment contracts on her behalf.[40] Defendant Thomasina Hodges did not sign the Car Order or any of the other contractual documents and she was the only licensed dealer with whom plaintiffs dealt.

Finally, the regulations prohibited defendants from causing or permitting plaintiffs to sign the Car Order with blanks in it or until the information therein was certified correct:

No dealer shall cause or permit any instrument of security covering the sale or assignment of a motor vehicle by him to be signed by a purchaser in blank or prior to the time all information required by these regulations has been completed in the body of the instrument of security by the dealer and certified by him to be correct . . . . 5AA D.C.R.R. § 3.14 (1970).

Here, as noted *supra,* the document did not contain the certification of truth or signature by the dealer, as required by 5AA D.C.R.R. § 3.1(b) (1970), and not all blanks had been filled in when plaintiffs signed the contract. Defendants therefore violated the prohibition of section 3.14 by permitting plaintiffs to sign the document at all.

Given the obvious nature of the cited violations of the D.C. Regulations, the real issue is not whether defendants violated the Regulations, but whether the Court should imply from the Regulations and related statute a civil remedy that would permit plaintiffs to avoid the contract and recover the amounts paid thereunder. The cited violations of the Regulations are misde-

---

36. 5AA D.C.R.R. § 3.1(b) (1970).

37. 5AA D.C.R.R. § 3.1(d) (1970).

38. The Regulations provide that the instrument of security may provide that the holder thereof can collect a delinquency and collection charge for a default of more than 10 days, not 5, as defendants' Security Agreement stated, but the delinquency charge may not exceed 5% of the payment in default or $5, whichever is less, or the rate of 8% per annum. Five percent of plaintiffs' scheduled payment of $78.57 would have been only $3.93, not the flat $5 charge imposed by defendants. 5AA D.C.R.R. § 3.11 (1970).

39. 5AA D.C.R.R. § 3.1(a) (1970).

40. Plaintiffs' Exhibit 15.

meanors punishable under D.C.Code § 40–907 (1973) and 5AA D.C.R.R. § 7.1 (1970), and can be the basis for suspension or revocation of licenses.[41] However, the statute does not expressly provide for a civil remedy against a licensee.[42] In addition to the basic question of whether to imply a civil remedy, the Court must also consider defendants' objection that the doctrine of election of remedies precludes plaintiffs from recovering damages under TILA while also obtaining restitution of amounts paid by avoiding the contract.

The cases that have interpreted the so-called District of Columbia Loan Shark Law[43] provide ample authority for holding in the instant case that plaintiffs may recover the purchase price of the vehicle. The D.C. Installment Sales of Motor Vehicles Act and the related regulations were enacted to protect the class of consumers from sharp practices by requiring full disclosure of credit terms and, like the Loan Shark Law, by requiring dealers and sales personnel to obtain licenses. Both the Loan Shark Law and the Regulations on Buying, Selling and Financing of Motor Vehicles impose criminal sanctions on any person who engages in the described activity without obtaining a license to do so.[44]

In suits brought by aggrieved borrowers from unlicensed loan sharks, District of Columbia courts have allowed the borrower to recover damages against the lender on a theory of wrongful foreclosure,[45] or to successfully defend against replevin actions brought by the lender to recover the collateral.[46] In so ruling the courts reason that a loan contract entered into by an unlicensed loan shark is illegal, because it is "made in violation of a statutory prohibition designed for police or regulatory purposes."[47] The illegality of the contract renders it "void," in a loose sense of the word, in that the contract "confers no right on the wrong-doer"[48] and therefore cannot be enforced against the borrower. The result of treating the contract as unenforceable by the lender is that the lender obtains no right or title in the collateral. The borrower can therefore recover his equity in the collateral after the lender has foreclosed or may successfully defend against the foreclosure action itself.[49]

The Court is persuaded that in this case, where defendants violated numerous and fundamental provisions of the D.C. Regulations governing installment sales of motor vehicles, the sale contract was illegal and therefore "void" as that term is used in the Loan Shark cases discussed *supra.* The contract, being unenforceable, gave defendants no right to foreclose on the automobile. Thus the foreclosure was wrongful and plaintiffs are entitled to damages therefor in the amount of the payments made, minus the rental value of the car for the period during which plaintiffs used it and the cost of towing the car from Fredericksburg, which defendants incurred at plaintiffs' re-

41. 5AA D.C.R.R. § 2.8 (1970).

42. The Code does create a civil remedy against the licensee's surety, however. See D.C.Code § 40–903(c) (1973).

43. D.C.Code § 26–601 *et seq.* (1973).

44. D.C.Code § 26–601 (1973) (Loan Shark Law); D.C.Code § 40–907 (1973); 5AA D.C.R.R. § 2.1(a) (1970).

45. *Royall v. Yudelevit,* 106 U.S.App.D.C. 1, 268 F.2d 577 (1959).

46. *Hartman v. Lubar,* 77 U.S.App.D.C. 95, 133 F.2d 44 (1942).

47. *Id.* at 45.

48. *Id.*

49. *Royall v. Yudelevit,* 106 U.S.App.D.C. 1, 268 F.2d 577 (1959); *Hartman v. Lubar,* 77 U.S. App.D.C. 95, 133 F.2d 44 (1942). The California courts apply the same reasoning in purchasers' actions based on violations of California's motor vehicle installment sales statute. Where the seller has repossessed an automobile that was sold in violation of the California motor vehicle installment sales statute, the courts allow the purchaser to recover the amount of the payments made, minus the rental value of the car for the period during which purchaser possessed it. See *General Motors Acceptance Corp. v. Kyle,* 54 Cal.2d 101, 4 Cal.Rptr. 496, 351 P.2d 768 (1960), and cases cited therein; see generally *Annot.,* 14 A.L.R.3d 330 (1967).

quest. The $158.75 payment for tags, title, and tax will also be excluded from the amount returned to plaintiffs, for the governmental charges were in fact paid over by defendants to the District of Columbia. Plaintiffs cite no authority to support their request for inclusion of the governmental charges in the amount to be returned to them. This measure of damages should make each party whole by returning to each the value paid to the other, in accordance with basic equity principles.

 Plaintiffs will be allowed to recover damages for wrongful repossession as well as the statutory damage award under the Truth in Lending Act. Nothing in TILA suggests that the provision for statutory damages and traditionally available common law remedies were meant to be mutually exclusive.[50] Moreover, the two Circuit Courts of Appeals that have considered the election of remedies question in the context of TILA suits ruled that both rescission and statutory damages may be obtained in actions based on TILA itself.[51] If both remedies are available in actions based on the statute, surely an award of the common law remedy of rescission based on non-TILA causes of action does not preclude the simultaneous award of statutory damages under TILA.

### C. Claims for Wrongful Repossession Based on D.C. Consumer Protection Act.

 Counts IV and VI of the complaint seek damages pursuant to D.C.Code § 28–3813 (1973) for violations of the D.C. Consumer Credit Protection Act.[52] Specifically plaintiffs complain that defendants violated § 28–3812(b)(1) of the Act by accelerating the balance due and repossessing the used Cadillac prior to the expiration of the 30-day grace period created by the statute. Section 28–3812(b)(1) provides as follows:

> During the thirty-day period after a default consisting of a failure to pay money the creditor may not because of the default (A) accelerate the unpaid balance of the obligation, (B) bring action against the debtor, or (C) proceed against the collateral.

Although there may be a dispute in this case as to the reason for the breakdown of the car, and whether plaintiffs or defendants were responsible for any needed repairs, it is undisputed that on September 17, 1974, plaintiffs were notified by a letter from defendant Thomasina Hodges that the car had been repossessed and that the full balance on the contract had been accelerated.[53] The first scheduled payment of $78.57 on the car was due on August 23, 1974, and a second came due on September 6, 1974. The car had broken down on August 21, 1974, and there was a dispute between the parties as to who was responsible for needed repairs.[54] However, on September 17, 1974, when defendants deemed the car repossessed and accelerated the balance, only 25 days had elapsed since the first due date. Thus defendants violated the 30-day grace period mandated by the D.C. Consumer Protection Act quoted above.

Section 28–3813(d)(1) of the Act provides that consumers aggrieved by violations of the Act may recover "in addition to the damages the law otherwise allows, 10 percent of the transaction total, if applicable, or $100, whichever is greater. . . ." Award of the statutory penalty is expressly committed to the court's discretion. Consequential and special damages, plus punitive damages, may be recovered in lieu of the specific statutory penalty where there are

---

**50.** See Comment, 57 Iowa L.Rev. 199, 205 (1971).

**51.** See *Sellers v. Wollman,* 510 F.2d 119 (5th Cir. 1975); *Eby v. Reb Realty, Inc.,* 495 F.2d 646 (9th Cir. 1974); but see *White v. Arlen Realty & Development Corp.,* 374 F.Supp. 151 (D.Md.1974); *Bostwick v. Cohen,* 319 F.Supp. 875 (N.D.Ohio 1970).

**52.** D.C.Code § 28–3816 (1973 ed.). The Act applies to the transaction at issue here since it is a consumer credit sale as defined in the Act. See D.C.Code § 28–3802(2) (1973).

**53.** Plaintiffs' Exhibit 11.

**54.** Plaintiffs' Exhibit 14.

"wilful and repeated violations.[55] Section 28–3813(a) requires that the remedies be "liberally administered to the end that the consumer . . . shall be put in at least as good a position as if the creditor had fully complied with this chapter."

Despite the breadth of the available statutory remedies, in this action equitable considerations weigh against the award of any monetary relief pursuant to § 28–3813. The Court has already awarded plaintiffs the amount of their payments to defendants, and that remedy satisfies the mandate of § 28–3813(a) that plaintiffs be put in as good a position as if the defendants had complied with the chapter. Therefore no reason appears to justify a discretionary award of the statutory 10% penalty. Moreover, plaintiffs have proven no consequential or special damages beyond the amount of their payments to defendants, and the undisputed facts do not justify an award of punitive damages at this time. Plaintiffs are therefore entitled to summary judgment on the issue of defendants' liability on Counts IV and VI of the Amended Complaint, but not on the issue of damages.

### D. *Defendants' Counterclaim for Deficiency Judgment.*

Count VIII of the Amended Complaint requests a declaratory judgment that plaintiffs are not liable for the deficiency balance which defendants seek in their counterclaim. On this motion plaintiffs also urge the dismissal of the counterclaim. Plaintiffs cite numerous provisions of D.C. law which clearly bar the relief sought in defendants' counterclaim.[56] No further discussion of these provisions is required, however, for defendants have admitted in their opposition to this motion,[57] and at oral argument, that they cannot lawfully recover on the counterclaim. Accordingly, summary judgment will be entered for plaintiffs and against defendants on defendants' counterclaim.

### E. *Punitive Damages.*

 In addition to actual and statutory damages, plaintiffs also urge the Court to award punitive damages on this motion. The Court does not share plaintiffs' conviction, however, that the undisputed facts justify a finding of knowing and wilful violation of the statutes and regulations discussed heretofore. Moreover, the undisputed facts do not demonstrate that the $1695.00 price of the used Cadillac contained an "exorbitant finance charge," as plaintiffs contend. Any award of punitive damages must therefore await the trial of this matter.

---

**55.** D.C.Code § 28–3813(a) (1973).

**56.** D.C.Code § 28–3812(b)(1), (e)(3) (1973); 5AA D.C.R.R. §§ 5.2, 5.5 (1970).

**57.** See Defendants' Opposition, p. 5.