413 So.2d 15 (1982)
Thomas (Fred Phillip) ROUSH, Petitioner,
v.
STATE of Florida, Respondent.
No. 57241.
Supreme Court of Florida.
April 8, 1982.
*16 Franklin R. Harrison of Davenport, Johnston, Harris, Gerde, Harrison & Nabors, Panama City, for petitioner.
Jim Smith, Atty. Gen. and David P. Gauldin, Asst. Atty. Gen., Tallahassee, and Edward A. Miller, Chief Asst. State Atty. and William L. Wright, Asst. State Atty., Fourteenth Judicial Circuit, Panama City, for respondent.
PER CURIAM.
This cause is before the Court on petition for certiorari to review two interlocutory orders of the Circuit Court of the Fourteenth Judicial Circuit, Bay County. In issuing the orders, the court passed upon the constitutionality of a state statute. Therefore, a final judgment in the cause, under the jurisdictional provisions in effect at the time the notice of certiorari was filed, would have been appealable to this Court. We have jurisdiction, article V, section 3(b)(3), Florida Constitution (1972), and uphold the constitutionality of section 812.035, Florida Statutes (1977),[*] and approve the action of the court below.
*17 In response to numerous consumer complaints that petitioner Thomas Roush's Guaranteed Transmission Service was involved in a continuing scheme of fabricating *18 or escalating transmission repair costs, law enforcement officers in Bay County initiated a secret investigation to determine whether Roush's business was perpetrating a fraud upon the public. During the investigation, an undercover agent, driving a vehicle with a nondefective transmission, left the car with Roush's business and requested the advertised "$9.95 Special" transmission tune-up. When the agent later called to learn whether the car had been serviced, she was told that unexpected problems in the transmission had been discovered and that the necessary repairs would require an additional payment of $39.95, plus parts. The agent agreed to the repair, but, on the following day, she was informed that the problems were more serious than originally suspected and that the estimated cost of the required service would be approximately $289.50. After giving her permission to have the necessary work performed  the cost of which finally amounted to $314.42  the agent retrieved the vehicle and turned it over to an expert transmission mechanic for inspection. The expert later testified that he could find no indication that any internal transmission repairs had in fact been made. Based on evidence gathered during the investigation, the employee who had dealt with the agent was arrested and charged with grand theft in violation of section 812.014, Florida Statutes (Supp. 1978), which defines and prohibits "theft."
Subsequently, on Friday, June 22, 1979, the state attorney, pursuant to section 812.035, filed a motion for equitable relief with the circuit court seeking to enjoin the operation of Roush's transmission repair business, to suspend his local business license, and to seize the property used in the business. At 12:50 p.m. that day Roush was served with the motion along with a summons and notice of hearing to be held at 3:00 p.m. the following Monday, June 25, 1979.
At the hearing Roush appeared with counsel and moved for a continuance, arguing that he had not been allowed adequate time to prepare a response to the state attorney's petition. The court denied the motion and proceeded with the hearing. The state then presented a number of witnesses who testified about the seemingly fraudulent activities of Roush's business. Among those testifying were several former customers who believed that they had paid for unnecessary and unsatisfactory transmission repairs under conditions similar to those discovered during the undercover operation. Roush offered no evidence. At the conclusion of the hearing, the court enjoined Roush from operating his transmission business until further order and ordered the seizure of all real and personal property used in the business.
By motion for rehearing, Roush raised the issues of the constitutionality of section 812.035 and the adequacy, under due process principles, of the notice provided him in this case. The court upheld the statute and held that the notice comported with due process. Roush contends these two rulings were in error.
At the outset, it should be noted that the instant case presents this Court with no problem of statutory construction. To buttress this conclusion, several observations are in order relative to the scope of the Florida Anti-Fencing Act, sections 812.005-812.037, Florida Statutes (1977 & Supp. 1978), and its applicability to Roush's conduct, as well as to the actions of the state and circuit court.
Doubtless, some would argue that the statute's short title, "The Florida Anti-Fencing Act," implies some intent on the part of the legislature to limit the scope of the act to fencing activities, thus removing Roush's alleged consumer fraud from the act's coverage. As this Court stated in King Kole, Inc. v. Bryant, 178 So.2d 2, 4 (Fla. 1965), however, a "title need not be an index to the contents. It is not necessary that it delineate in detail the substance of the statute." Further, in the presence of language as unequivocal as that embodied in the act, "[w]here the words selected by the Legislature are clear and unambiguous, ... judicial interpretation is not appropriate to displace the expressed intent." Heredia *19 v. Allstate Insurance Co., 358 So.2d 1353, 1355 (Fla. 1978) (emphasis supplied).
An examination of the Florida Anti-Fencing Act clearly reveals that, despite its narrow title, the act encompasses a range of activities far broader than trafficking in stolen property. One such activity embraced by the statute is theft. Section 812.014 provides that:
(1) A person is guilty of theft if he knowingly obtains or uses, or endeavors to obtain or use, the property of another with intent:
(a) To deprive the other person of a right to the property or a benefit therefrom.
(b) To appropriate the property to his own use or to the use of any person not entitled thereto.
Subsection 812.012(2)(d)(1) defines "obtains or uses" to mean any manner of "[c]onduct previously known as stealing; larceny; purloining; abstracting; embezzlement; misapplication; misappropriation; conversion; or obtaining money or property by false pretenses, fraud, or deception." (Emphasis supplied.) Although the act expands the common law notion of theft, it is undisputably within the legislature's power to provide that statutory expansion.
Since the language pertaining to theft is of such a clear and concise nature, this Court is guided by the rule that "unambiguous statutory language must be accorded its plain meaning." Carson v. Miller, 370 So.2d 10, 11 (Fla. 1979). Applying this rule to the facts of the instant case, it is clear that the alleged fraudulent and deceptive trade practices conducted by Roush's business constituted theft pursuant to the act and rendered Roush subject to the sanctions authorized by the act.
Unlike many criminal statutes, the Florida Anti-Fencing Act provides civil remedies, as well as criminal penalties, for violations of the act. Subsection 812.035(5) specifically confers upon any state attorney the authority to institute civil proceedings in response to violations of the act. Accordingly, in the instant case the Bay County State Attorney, armed with convincing evidence of Roush's fraudulent scheme, filed a motion for equitable relief with the circuit court, seeking imposition of the civil remedies provided by the act. In conducting a hearing on the Monday immediately following Roush's Friday receipt of service, the circuit court adhered to the dictate contained in subsection 812.035(5) that "the circuit court shall proceed as soon as practicable to the hearing" of actions brought under the section. (Emphasis supplied.) Although a weekend intervened between the service and hearing, the fact remains that the court followed the clear command of the section. And, just as the court's timing of its adjudication complied with the act, so too did the court's imposition of civil remedies.
Subsection 812.035(5) provides that "[p]ending final determination, the circuit court may at any time enter such injunctions, prohibitions, or restraining orders, or take such actions, ... as the court may deem proper." Further, the court may order the seizure of all property subject to forfeiture under section 812.035. § 812.035(3), Fla. Stat. (1977). Subject to forfeiture is "[a]ll property ... used in the course of, intended for use in the course of, derived from, or realized through, conduct in violation" of the act. § 812.035(2), Fla. Stat. (1977). Consequently, "after making due provisions for the rights of innocent persons" (subsection 812.035(1)), the circuit court had at its disposal a wide range of civil remedies with which it could prevent further violations of the act by Roush. In ordering the seizure of Roush's business property and temporarily restraining the conduct of his business activities, the court acted squarely within the bounds of its legislatively given authority. Thus, it is clear that the conduct of Roush's business was of a nature sufficient to bring it within the scope of the act. Likewise, the statute sanctioned the actions taken by the state and circuit court.
While any question relative to the applicability of the act here is easily resolved, a more difficult question is posed by the contention that enforcement of the civil *20 remedies section of the act resulted in violations of Roush's procedural and substantive due process rights. We find, however, no merit to this claim.
Roush alleges that the speedy fashion in which the circuit court adjudicated his case deprived him of reasonable notice and the time to mount an adequate defense to the charges facing him, deprivations tantamount to infringements on his procedural due process guarantees. As noted, however, the court's timing of its hearing was in response to the directive contained in subsection 812.035(5) that actions brought under the section "shall proceed as soon as practicable." Given the remedial nature of the act (section 812.037), we find nothing unreasonable about this directive and believe the circuit court was justified in conducting the hearing at the earliest possible opportunity in an effort to prevent further harm. The state presented ample evidence of the continuing nature of Roush's alleged wrongdoing, and, had the court not acted as and when it did, additional consumers could well have been bilked. Militating further against Roush's procedural argument is the fact that, at the hearing, he was represented by counsel. Obviously, had he chosen to do so, Roush could have countered the state's evidence through a declaration of innocence or by a proffer of mitigating or extenuating circumstances. That he instead chose to remain silent at the hearing was an informed, though consequence-laden decision. It can be surmised that, had Roush offered some defense, the lower court might well have been disposed to favorably entertain his later request for a continuance. In any event, there is nothing in the record to indicate that the court took any action violative of Roush's procedural rights, and we affirm the court's denial of the motion for continuance and rehearing.
Having disposed of Roush's procedural argument, we turn to the issue of whether the civil remedies imposed by the court in any way violated his substantive due process rights. As noted, section 812.035 gives the circuit court the discretionary power to order a number of harsh civil remedies, including injunctions, divestitures, restraining orders, forfeitures and seizures  all of which can be imposed in the absence of a criminal conviction. As with any discretionary power, the possibility of abuse is ever present. Clearly, a court must be extremely cautious and circumspect in exercising the broad powers conferred by the act. As dictated by subsection 812.035(1), however, a circuit court may act only "after making due provisions for the rights of innocent persons." As earlier demonstrated, the circuit court gave Roush every opportunity to establish his innocence at the hearing. Further, in light of the facts of this case, the court acted in a reasonable manner calculated to prevent future public harm. In no way can it be said that the court abused its discretion.
Nor can it be said that the sanctions imposed by the court were unreasonable or unconstitutional. Although the constitutionality of the civil remedies section of the act is one of first impression for this Court, federal courts have determined that the nearly identical civil remedies provision contained in the Organized Crime Control Act of 1970 (18 U.S.C. § 1964 (1976)) in no way deviates from constitutional requirements. In the leading federal case the court in United States v. Cappetto, 502 F.2d 1351 (7th Cir.1974), upheld the constitutionality of 18 U.S.C. § 1964 and stated:
Section 1964 provides for a civil action in which only equitable relief can be granted. The relief authorized by that section is remedial not punitive and is of a type traditionally granted by courts of equity. It is the same kind of equitable relief that federal courts have been granting for generations in civil actions under Section 4 of the Sherman Act and Section 15 of the Clayton Act, 15 U.S.C. §§ 4 and 25.
Id. at 1357. Further, the court found that Congress had the power to provide both criminal and civil remedies for violations of the statute and stated:
It has thus been settled ... that acts which may be prohibited by Congress may be made the subject of both criminal *21 and civil proceedings, and the prosecuting arm of the government may be authorized to elect whether to bring a civil or criminal action, or both. A civil proceeding to enjoin those acts is not rendered criminal in character by the fact that the acts also are punishable as crimes.
Id. Additionally, the court made clear that equitable principles govern the granting of relief pursuant to section 1964 and stated:
Whether equitable relief is appropriate depends, as it does in other cases in equity, on whether a preponderance of the evidence shows a likelihood that the defendants will commit wrongful acts in the future, a likelihood which is frequently established by inferences drawn from past conduct.
Id. at 1358. Accordingly, Cappetto upheld the lower court's injunction restraining the defendants from continuing their alleged gambling activities, even though they had not been convicted of a criminal offense.
Cappetto's interpretation of the civil remedies section of the federal act was extended in Farmers Bank v. Bell Mortgage Corp., 452 F. Supp. 1278 (D.Del. 1978). In Farmers Bank the federal district court expressly rejected the argument that, absent conviction of a violation of the act, a defendant cannot be subject to the civil remedies of the act. Instead, the court held that the civil remedies section of the act "does not condition that [civil] cause of action in any way upon a previous conviction under the criminal provisions of the Statute." Id. at 1280.
These federal cases represent a reasoned and sound analysis of the issue. In line with these cases, we hold that it was indeed within the power of our legislature to provide civil remedies for violations of the Florida Anti-Fencing Act and that the imposition of those remedies is in no way dependent upon an adjudication of guilt. Further, we find that the civil sanctions imposed by the circuit court, although stringent, were justified by the act, were responsive to the remedial goals of the act, and in no way violated Roush's constitutional rights. By seizing Roush's property and temporarily suspending his business operations, the circuit court effectively inhibited future fraudulent conduct and protected the consuming public from further harm.
Of special significance in this case is the fact that the actions taken by the circuit court were of a temporary nature, designed to prevent continuing harm. The record offers no evidence that the court took steps to impose forfeiture, the strictest civil remedy provided by the act, and we have no occasion to consider the constitutional ramifications had the court chosen to order forfeiture.
We find nothing unconstitutional about section 812.035. Certainly, the civil remedies provided therein can be considered stringent. Certainly, the court that imposes those remedies upon one who has not been criminally convicted must be careful in exercising its discretionary power. But just as certainly, the section represents a purposeful and meaningful legislative effort to combat theft and theft-related criminal activities. The authorized civil sanctions provide the state with an effective tool to halt the continuing harmful effects of those activities. Further, the civil remedies benefit aggrieved citizens, affording them the incentive to pursue claims for loss caused by various forms of theft. Accordingly, we hold that section 812.035, Florida Statutes (1977), is constitutional both on its face and as applied in this case, and we affirm the action of the circuit court.
It is so ordered.
SUNDBERG, C.J., and ADKINS, ALDERMAN and McDONALD, JJ., concur.
BOYD, J., dissents with an opinion.
OVERTON, Justice, dissenting:
I do not find the legislature had any intent to have this criminal Anti-Fencing Act construed to provide civil consumer protection remedies.
BOYD, Justice, dissenting.
I dissent for several reasons. The first ground, which I discuss first because we *22 should if possible avoid a statutory construction requiring a holding of unconstitutionality, is that the Court errs in giving effect to the literal words of section 812.035 when such effect is clearly at variance with the legislative intent.
The face of the statute demonstrates an ambiguity requiring judicial construction. While the literal language of the statute is susceptible of application to all forms of the new broadly defined crime of theft, the act of which section 812.035 is a part is denominated "The Florida Anti-Fencing Act." § 812.005, Fla. Stat. (1977). Since we know that "fencing" refers to the marketing of stolen goods, and since sections 812.012-812.037 deal with theft, trafficking in stolen property, and related offenses, we must recognize the difficulty involved in applying the act to the situation of alleged fraud in the auto repair business.[1] "In construing a statute, this Court is committed to the proposition that a statute should be construed and applied so as to give effect to the evident legislative intent, regardless of whether such construction varies from the statute's literal meaning." Griffis v. State, 356 So.2d 297, 299 (Fla. 1978). The legislative history of the act finally resolves the ambiguity and demonstrates that the civil remedies provided for were intended to be used against the problem of trafficking in stolen property.[2]
Second, even if the legislature intended for the statute to be applied in cases such as this, the Court errs further in failing to see the unconstitutionality of the legislative scheme. Petitioner's business was closed and his property seized without proof of wrongdoing on his part. He has suffered deprivation of property without due process of law.
The statute in question declares certain conduct to be against public policy and prohibits such conduct. The statute seeks to deter such conduct by punishing violations. The statute therefore is penal in nature, even though the penalties provided for are denominated "civil remedies." A penal sanction is no less penal simply because we call it a "civil" rather than a "criminal" penalty.
The Court observes and relies upon the fact that petitioner was given an opportunity to prove his innocence. When the state seeks to close a business and seize business property, it should be required to prove that the defendant violated the law. Under our constitution, the process of imposing penalties on offenders is accusatorial and not inquisitorial. The accused is not required to prove anything but is presumed innocent. The Court's shifting of the normal constitutionally-based burden of proof is sought to be justified on the basis of the distinction between "criminal" and "civil" penalties. In light of the harsh penalties authorized by the statute and imposed upon the petitioner in this case, I find the distinction artificial.
*23 Third, even if it could be said that the exigencies of our times demand that under certain circumstances we dispense with the necessity for a trial as traditionally understood in our jurisprudence, still the procedure followed in the present case would not comport even minimally with due process standards. That is, even if it were constitutional to require the accused to prove his innocence or else lose his livelihood and property, it still would not be constitutional to require him to prove his innocence on Monday after being served notice on Friday afternoon. Even if the majority were correct in holding that the statute is not oppressive in substance, we should still hold that it is oppressive in procedure.
The concept of due process, the presumption of innocence, the requirement that only those shown to have violated published laws may be subjected to penal sanctions  these are principles that the founders of this Republic found so important that they insisted on their being written into the basic charter as the Bill of Rights. They were intended as protections against arbitrary and oppressive governmental action. The framers of the Bill of Rights knew from history and from personal experience that without such protections, the rights of individuals are commonly trampled upon by kings and governments as they go about the business of promulgating and enforcing "public policy." The history of our Republic shows that the wisdom of the founding fathers has been expanded upon through the recognition that the states, and not just the national government, are also prohibited from the arbitrary infliction of punishments and deprivations.
The Court's construction of the statute may have far-reaching effects; small businesses circumstantially linked to fraud on customers are not the only concerns that may be affected. A private firm with millions of dollars worth of assets could have its property confiscated by the state because one dishonest employee has cheated some customers even without the knowledge of the managers or owners. I do not think the legislature intended such results, but if it did then the statute is clearly unconstitutional.
NOTES
[*] 812.035 Civil remedies; limitation on civil and criminal actions. 

(1) Any circuit court may, after making due provisions for the rights of innocent persons, enjoin violations of the provisions of ss. 812.012-812.037 by issuing appropriate orders and judgments, including, but not limited to:
(a) Ordering any defendant to divest himself of any interest in any enterprise, including real estate.
(b) Imposing reasonable restrictions upon the future activities or investments of any defendant, including, but not limited to, prohibiting any defendant from engaging in the same type of endeavor as the enterprise in which he was engaged in violation of the provisions of ss. 812.012-812.037.
(c) Ordering the dissolution or reorganization of any enterprise.
(d) Ordering the suspension or revocation of any license, permit, or prior approval granted to any enterprise by any department or agency of the state.
(e) Ordering the forfeiture of the charter of a corporation organized under the laws of the state or the revocation of a certificate authorizing a foreign corporation to conduct business within the state, upon finding that the board of directors or a managerial agent acting on behalf of the corporation, in conducting the affairs of the corporation, has authorized or engaged in conduct in violation of ss. 812.012-812.037 and that, for the prevention of future criminal activity, the public interest requires the charter of the corporation forfeited and the corporation dissolved or the certificate revoked.
(2) All property, real or personal, including money, used in the course of, intended for use in the course of, derived from, or realized through, conduct in violation of a provision of ss. 812.012-812.037 is subject to civil forfeiture to the state. The state shall dispose of all forfeited property as soon as commercially feasible. If property is not exercisable or transferable for value by the state, it shall expire. All forfeitures or dispositions under this section shall be made with due provision for the rights of innocent persons.
(3) Property subject to forfeiture under this section may be seized by a law enforcement officer upon court process. Seizure without process may be made if:
(a) The seizure is incident to a lawful arrest or search or an inspection under an administrative inspection warrant.
(b) The property subject to seizure has been the subject of a prior judgment in favor of the state in a forfeiture proceeding based upon this section.
(c) The law enforcement officer has probable cause to believe that the property is directly or indirectly dangerous to the [public] health or safety.
(d) The law enforcement officer has probable cause to believe that the property is otherwise subject to forfeiture under this section.
(4) In the event of a seizure under subsection (3), a forfeiture proceeding shall be instituted promptly. When property is seized under this section, pending forfeiture and final disposition, the law enforcement officer may:
(a) Place the property under seal.
(b) Remove the property to a place designated by the court.
(c) Require another agency authorized by law to take custody of the property and remove it to an appropriate location.
(5) The Department of Legal Affairs, any State Attorney, or any state agency having jurisdiction over conduct in violation of a provision of ss. 812.012-812.037 may institute civil proceedings under this section. In any action brought under this section, the circuit court shall proceed as soon as practicable to the hearing and determination. Pending final determination, the circuit court may at any time enter such injunctions, prohibitions, or restraining orders, or take such actions, including the acceptance of satisfactory performance bonds, as the court may deem proper.
(6) Any aggrieved person may institute a proceeding under subsection (1). In such proceeding, relief shall be granted in conformity with the principles that govern the granting of injunctive relief from threatened loss or damage in other civil cases, except that no showing of special or irreparable damage to the person shall have to be made. Upon the execution of proper bond against damages for an injunction improvidently granted and a showing of immediate danger of significant loss or damage, a temporary restraining order and a preliminary injunction may be issued in any such action before a final determination on the merits.
(7) Any person who is injured in any fashion by reason of any violation of the provisions of ss. 812.012-812.037 shall have a cause of action for three-fold the actual damages sustained and, when appropriate, punitive damages. Such person shall also recover attorneys' fees in the trial and appellate courts and costs of investigation and litigation.
(8) A final judgment or decree rendered in favor of the state in any criminal proceeding under ss. 812.012-812.037 shall estop the defendant in any subsequent civil action or proceeding as to all matters [as to] which such judgment or decree would be an estoppel as between the parties.
(9) The Department of Legal Affairs may, upon timely application, intervene in any civil action or proceeding brought under subsection (6) or subsection (7) if he certifies that, in his opinion, the action or proceeding is of general public importance. In such action or proceeding, the state shall be entitled to the same relief as if the Department of Legal Affairs had instituted this action or proceeding.
(10) Notwithstanding any other provision of law, a criminal or civil action or proceeding under ss. 812.012-812.037 may be commenced [at any time within] 5 years after the cause of action accrues. If a criminal prosecution or civil action or other proceeding is brought, or intervened in, to punish, prevent, or restrain any violation of the provisions of ss. 812.012-812.037, the running of the period of limitations prescribed by this section with respect to any cause of action arising under subsection (6) or subsection (7) which is based in whole or in part upon any matter complained of in any such prosecution, action, or proceeding shall be suspended during the pendency of such prosecution, action, or proceeding and for 2 years following its termination.
(11) The application of one civil remedy under any provision of ss. 812.012-812.037 shall not preclude the application of any other remedy, civil or criminal, under ss. 812.012-812.037 or any other section of the Florida Statutes.
[1] The designation, "Florida Anti-Fencing Act" is not a statutory "title" as that term is used in article III, section 6, Florida Constitution. Therefore, King Kole, Inc. v. Bryant, 178 So.2d 2 (Fla. 1965), cited by the Court, is inapposite. The designation is, however, part of the statute and is one of the things we must look at in determining legislative intent.
[2] Section 812.035 was enacted when the 1977 legislature passed and the governor approved the Committee Substitute for Senate Bill No. 1431. Ch. 77-342, Laws of Fla. The history of the bill demonstrates the intent that the civil remedies were designed for use against persons trafficking in stolen property.

The bill creates two new classes of crime: the first trafficking in stolen property, and the second and more severe crime, theft and trafficking in stolen property. The bill codifies existing law with respect to evidence of dealing in stolen property and precludes certain defenses. The bill provides for a fine and civil remedies, and provides for the rights of innocent parties.
Staff Analysis and Economic Statement, SB 1431 (1977) (emphasis in original). The analysis also explained that the language was borrowed from the civil remedies section of the Florida Racketeer Influenced and Corrupt Organizations Act. See § 943.464, Fla. Stat. (1979). The civil remedies section was adopted because of the difficulties law enforcement officials face in apprehending and prosecuting distributors of stolen property. See Blakely and Goldstein, Criminal Redistribution of Stolen Property: The Need for Law Reform, 74 U.Miami L.Rev. 1512, 1601-11 (1976).