# JONES v ORLANDO SECOND CAR CENTER, INC.

## Case No. AP88-05

Ninth Judicial Circuit, Orange County

*July 15, 1988*

### APPEARANCES OF COUNSEL

**Kenneth L. Mann** for appellant.

**Susan Woodlief** for appellant.

**John Englehardt** for appellee.

### OPINION OF THE COURT

FREDERICK PFEIFFER, Circuit Judge.

### *ORDER ON APPEAL*

This cause came on to be heard on June 2, 1988 for oral argument on the above-styled appeal. Upon consideration of the briefs of the

parties, the record-on-appeal, the law and arguments of counsel, it is hereby found and ORDERED:

## OPINION

1. This cause should be and is hereby reversed and remanded to the trial court for new trial on the Plaintiff's counts relating to alleged violations of the Motor Vehicle Sales Finance Act ("MVSFA") [§ 520.01 *et seq., Fla. Stat.* (1985)] and the Florida Deceptive and Unfair Trade Practices Act ("Little FTC Act") [§ 501.201 *et. seq., Fla. Stat.* (1985)].

2. The final judgment for the Defendant on directed verdict on Plaintiff's civil theft and civil RICO counts is affirmed.

3. At the retrial, Plaintiff shall be entitled to introduce the previously excluded evidence of actual and average wholesale costs of Defendant's vehicles and similar vehicles, assuming proper predicate.

4. The court further remands to the trial court the determination of Plaintiff's reasonable attorney's fees on this appeal pending the outcome of the retrial.

## DISCUSSION

I. *The Facts.* Because this appeal arose from a final judgment entered on directed verdict in favor of defendant upon the close of Plaintiff's case-in-chief at a jury trial, the facts and reasonable inferences therefrom must necessarily be construed for appellate purposes in the light most favorable to the Plaintiff/Appellant.[1] The facts hereafter recited are accordingly cast in such light. Miss Jones presented legally sufficient evidence as follows. In June, 1984, she purchased on credit from the Defendant, a licensed used car dealer under the MVSFA, a 1975 Datsun B-210 automobile with over 90,000 miles at the time of purchase; the contract for sale recited a "cash price" of $2,995, a finance charge of "none" and an annual percentage rate of "none". Said words "none" were printed on the contract, as they are in all of the dealer's sales contracts. For the five year period 1980 through 1984, although it purported to offer to sell for cash, the dealer only consummated one actual cash retail sale, the remainder being on deferred payment terms, generally with about 10% down payment and the balance in weekly payments over 60 to 70 weeks. The cars sold by the dealer during this time period were primarily cars which were six to ten years of age and did not purport to be "vintage", "classic" or "exotic" cars.

---

[1] *Kilgore Seed Co. v Pearce,* 103 So.2d 112 (Fla. 1958).

On all these credit sales, the dealer represented that there was no finance charge and that the sales price equaled the "cash price" of the car. The dealer had a sign in front of its premises prominently disclosing "no interest", which the dealer admitted was intended to induce customers to rely thereon. The dealer's owner further admitted awareness that both the MVSFA and the federal truth-in-lending law ("TILA") required disclosure of interest if any was charged, and that the MVSFA additionally limited the amount of interest that could be charged on Jones' car to approximately 30% annual percentage rate (17% add-on).

The dealer further testified that its sale of these cars on credit terms was a high risk business, that the price at which it sold its cars reflected this risk, that its customers run a 90% delinquency rate and over a 50% repossession rate, that the bookkeeper spent over 50% of her time on collections, and that the delinquency fees and repossession fees did not cover the costs of collection.

The Plaintiff's expert witness, a used car dealer who sells similar cars as the defendant but who sells them primarily for cash rather than on credit terms, testified that based upon the age and mileage of the nine year old B210, the number of B210's produced and the non-distinctive nature of the car, and his experience, that he was able to opine on the maximum range of retail cash value for the car, even without personally inspecting it, of $1,300 to $1,800 as of June, 1984. He further identified the NADA Used Car Guides and NADA Official Older Used Car Guides as recognized authorities on average wholesale and retail values of cars, and noted that, if anything, the values published in the NADA guides are somewhat high for the Orlando area.

II. *The MVSFA.* From the foregoing testimony, from the NADA book admitted into evidence, and from a chart admitted into evidence comparing the purported "cash prices" of representative sales of the Defendant's cars with the average NADA values thereof, which reflected in virtually all instances that the Defendant's "cash prices" were materially in excess of the NADA average retail cash values for said cars (ranging from 40% higher on the low side to as much as almost 300% higher, on the high side), a jury could have concluded that the dealer regularly, materially and wilfully inflates its "cash price" in order to both conceal finance charges from the consumer as well to circumvent the interest rate limitation imposed by the MVSFA, and thereby wilfully violating both the disclosure and interest rate ceilings imposed thereby. With particular regard to Jones' car, if the true cash price were $1,500, the actual annual percentage rate was over

140%, and at the $1,800 maximum retail cash value of the car as testified to by Plaintiff's expert witness, the annual percentage rate would have been over 97%.

The trial court further erred in finding, as a matter of law, that there was no reliance by Jones upon the dealer's representations of cash price and zero finance charge. First, Jones specifically testified on direct examination that part of her decision was based upon the representations of cash price and the absence of a finance charge and that she would not have purchased the car if she had known that the actual interest rate were 97% or greater. The weight of this testimony against her testimony on cross examination focusing on her need for a car and her need for low weekly payments, was for the jury, and not for the court.

More fundamentally, the question of reliance was irrelevant in any event under the MVSFA, as the Act clearly is devoid of any requirement of consumer reliance upon a misrepresentation as a prerequisite for damages. The Act merely requires a wilful violation for recovery. § 520.12(2), *Fla. Stat.* (1985). Indeed, if reliance were required as a condition to recovery, a hapless consumer who agreed to purchase and finance a car at a prominently disclosed 97% interest rate would be without a remedy for lack of any misrepresentation, despite the clear mandate of sections 520.08 (rate ceilings) and 520.12(2) (wilful violations of disclosure requirements *or* interest rate ceilings).

The dealer contends on appeal that even if the foregoing be true, the MVSFA can only be used as a shield, and not as a sword, *i.e.,* it bars judicial recovery by the dealer of non-disclosed or excess finance charges, but does not grant affirmative relief to a consumer injured thereby. In brief response, and disregarding defendant's possible waiver of this issue, this court finds:

(a) The 1987 amendments to the MVSFA clarified, rather than changed, the original legislative intent of affording the consumer affirmative relief.[2]

(b) An express[3] or implied[4] cause of action for affirmative relief under the pre 1987 MVSFA can be found from the obvious purposes of the Act to protect the consumer, albeit inartfully drafted.

III. *Little FTC Act.*

---

[2] *See, e.g., Dade County v AT&T Information Systems,* 485 So.2d 1302 at 1304-05 (Fla. 3d DCA), *review den.,* 494 So.2d 1150 (Fla. 1986).

[3] *Tel Service Co. v General Capital Corp.,* 227 So.2d 667 at 672-73 (Fla. 1969).

[4] *Cort v Ash,* 441 U.S. 66 (1975).

The above findings and conclusions of law on the MVSFA apply with even greater force to the Plaintiff's count under the Little FTC Act. Indeed, except in situations not here relevant, the Little FTC Act does not even require a showing of willfulness by the dealer.[5] Also, as with the MVSFA, reliance by the consumer does not appear to be a requirement for recovery under the Little FTC Act. The focus of this statute is on the conduct of the merchant, and not of the consumer, and *a fortiori* should this focus apply, where, as here, the dealer admits that he intended for the consumer to rely upon his representations of the absence of any finance charge. It can be hardly be denied that a consumer who pays concealed interest at a 97% annual rate has been damaged, regardless of the fact that the consumer may have naively thought at the time that the car was worth the price. Such erroneous belief having been encouraged and induced by the merchant, the merchant is hardly in a position to complain after the fact that it was the consumer's fault that the merchant was successful in his ploy. Finally, the regulations promulgated pursuant to the authority granted under the Little FTC Act expressly make it a *per se* unfair and deceptive act or trade practice to add any impermissible items to the "cash price" of the car, which prohibition obviously extends to hidden finance charges.[6]

The learned trial court appears to have evaluated Jones' claim under traditional common law fraud analysis. Yet the Little FTC Act expressly evinces a legislative intent to liberalize the opportunity for consumer recoveries from errant merchants,[7] and any retreat from such mandate of liberalization must necessarily come from the legislature and not from the judiciary.

### IV. *Civil theft and RICO.*

The primary provisions of the theft statute relevant to appellant's civil theft claim are found in §§ 812.014(1) and 812.012(2)(c), (d)(1), (2), *Fla. Stat.* (1985):

812.014 Theft.—

(1) A person is guilty of theft if he *knowingly obtains or uses, or endeavors to* obtain or to use, the property of another with intent to, either temporarily or permanently:

---

[5] *Compare* §§ 501.202 and 501.211(2) *with* § 501.2075, *Fla. Stat.* (1985).

[6] Rule 2-19.005(11), Florida Administrative Code; §§ 501.203(5), 501.205, *Fla. Stat.* (1985).

[7] *Urling v Helms Exterminators, Inc.,* 468 So.2d 451, 453 (Fla. 1st DCA 1985).

(a) deprive the other person of a right to the property or a benefit therefrom.

(b) appropriate the property to his own use or to the use of any person not entitled thereto. [emphasis added]

812.012 definitions—As used in §§ 812.012-812.037:

(2) "obtains or uses" means any manner of:

\* \* \*

(c) obtaining property by fraud, wilful misrepresentation of a future act, or false promise.

(d) 1. Conduct previously known as stealing; larceny; purloining; . . . or obtaining money or property by false pretenses, fraud, or deception;or

    2. Other conduct similar in nature.

Notwithstanding the foregoing definitions and the evidence supporting a finding of wilfulness described above, this court finds that Plaintiff's evidence was legally insufficient, as a matter of law, for a jury to find criminal intent, even though only a preponderance of the evidence thereof is necessary in a civil trial context,[8] thus barring both Jones' civil theft and RICO counts. In so holding, the court specifically rejects the applicability to said counts in the case *sub judice* of Plaintiff's various arguments in support of her position, *e.g.,* that numerous cases hold consumer fraud or commercial fraud can rise to the level of theft, civil theft, and civil RICO;[9] that the United States Supreme Court has held that "garden variety fraud" can be the proper subject of a Civil RICO claim;[10] that misdemeanor sanctions can be imposed for wilful violations of the MVSFA in addition to civil remedies;[11] that if the interest rate of over 97% demonstrated by the Plaintiff's evidence had arisen in a loan context instead of a sales context, such rate would be punishable by the felony loansharking provisions of § 687.071, *Fla. Stat.;* that the existence of a purported industry pattern or practice is no defense to civil RICO liability where

---

[8] *Senfeld v Bank of Nova Scotia Trust Co. (Cayman) Ltd.,* 450 So.2d 1157 (Fla. 3d DCA 1984).

[9] *Roush v State,* 413 So.2d 15 (Fla. 1982); *Reef Buick, Inc. v Elliott,* 477 So.2d 1035 (Fla. 4th DCA 1985) (civil theft); *Banderas v Banco Central del Ecuador,* 461 So.2d 265 (Fla. 3d DCA 1985) (RICO action grounded in commercial fraud); *See, e.g. Paulk v State,* 344 So.2d 304 (Fla. 2d DCA 1977).

[10] *Sedima, SPRL v Imrex Co.,* 105 S.Ct. 3275 (1985).

[11] § 520.12(1), *Fla. Stat.* (1985).

the underlying practice is akin to false pretenses;[12] and that despite the absence of Florida state court decisions on the MVSFA, there was an abundance of federal case law under the federal truth-in-lending act and under other jurisdictions' consumer protection laws suggesting the impropriety of the alleged subterfuge painted by the Plaintiff's evidence.[13]

This court finds the foregoing arguments insufficiently persuasive to permit the jury herein to find criminal intent with respect to the dealer's purported misrepresentations of its "cash price" and "finance charges", because, at least to some extent, they are based upon the issue of retail value.[14]

V. *The Exclusion of Evidence.*

The Plaintiff has further appealed the trial court's exclusion of evidence relating to the actual wholesale costs to the Defendant on representative purchases and to the average wholesale cost of similar vehicles. This court concurs with Plaintiff that said evidence is both relevant and material to the Plaintiff's case-in-chief, as tending to further corroborate both the typical condition of cars purchased and resold by the Defendant as less than average, as well as Plaintiff's contention that the dealer used a mark-up from its actual cost to its purported "cash price" substantially in excess of the industry norm for cash sales of used cars. Thus, said excluded evidence could reasonably be taken by the jury as further corroborating wilfulness[15] and the Plaintiff's contention that the dealer's purported "cash price" is regularly a myth and bears no reasonable relationship to the price its cars would bring in a bona fide retail cash transaction, contrary to the obvious intent of the legislature in formulating its definitions of "cash price"[16] and "finance charge."[17]

DONE and ORDERED in Chambers at Orlando, Orange County, Florida, this 15th day of July, 1988.

---

[12] *Morosani v 1st National Bank,* 703 F.2d 1220 (11th Cir. 1983) (misuse of prime rate, and use of 365/360 day interest computations.).

[13] *See, e.g., Yazzie v Reynolds,* 623 F.2d 638 (10th Cir. 1980); *Killings v Jeff's Motors, Inc.,* 490 F.2d 865 (5th Cir. 1974); and *Vines v Hodges,* 422 F. Supp. 1292 (D.D.C. 1976).

[14] *Criner v State,* 92 Fla. 483, 109 So. 417 (Fla. 1926).

[15] § 90.404(2)(a), *Fla. Stat.* (1987).

[16] § 520.02(1), *Fla. Stat.* (1985).

[17] § 520.02(4), *Fla. Stat.* (1985).