**G.M. BROD & COMPANY, INC., a Florida corporation, Plaintiff-Appellee Cross-Appellant,**

v.

**U.S. HOME CORPORATION, a Delaware corporation, Defendant-Appellant Cross-Appellee.**

Nos. 84–5087, 84–5096.

United States Court of Appeals, Eleventh Circuit.

May 10, 1985.

Richard C. Smith, Steel Hector & Davis, Miami, Fla., David Klingsberg, Kaye, Scholer, Fierman, Hays & Handler, New York City, for defendant-appellant cross-appellee.

Carl H. Hoffman, Hoffman & Hertzig, Coral Gables, Fla., for plaintiff-appellee cross-appellant.

Before FAY and JOHNSON, Circuit Judges, and DYER, Senior Circuit Judge.

DYER, Senior Circuit Judge:

This appeal involves a dispute resulting from the termination of a contract for the management of the Christie Lodge (the Lodge), a condominium hotel in Avon, Colorado. U.S. Home (Home) developed the Lodge and sold its condominium units to individual purchasers. Home hired G.M. Brod & Co., Inc. (Brod) to manage the Lodge and authorized it to enter into rental agreements with the unit owners. Brod managed the Lodge for three-and-a-half months, after which its management contract was terminated by Home.

Brod's action (so far as it is material to this appeal) was premised upon (1) Home's breach of the management contract; (2) Home's tortious interference with Brod's rental contracts with unit owners; (3) Home's tortious interference with Brod's business dealings with its employees; and (4) Home's violation of Florida Statute, Chapter 812, The Florida Anti-Fencing Act. Both compensatory and punitive damages were sought.

The jury found for Brod as follows: Breach of the management contract, $157,000 compensatory and $3,200 punitive damages; tortious interference with employees, $450,000 compensatory and $930,000 punitive damages; tortious interference with unit owners, $956,000 compensatory and

$1,550,000 punitive damages; violation of Florida Statute, Chapter 812, $33,000 compensatory (trebled by the district court under the provisions of the statute to $99,000 compensatory) and $50,000 punitive damages. Judgment was entered for Brod for $4,195,200.

In post-trial proceedings the district court found no basis in the evidence for separate damage awards on the claims of tortious interference with Brod's employees and Brod's relationship with unit owners. Brod accepted the district court's offer of a $450,000 remittitur of compensatory damages for interference with Brod's employees rather than submit to a new trial on the issue of damages for the claims of tortious interference. Subsequently, the district court also ordered a remittitur on the punitive damages of $930,000 awarded for interference with Brod's employees, which Brod did not accept. Thus the remittiturs ordered by the district court left a total award against Home of $1,212,000 compensatory and $1,603,200 punitive damages.

Home asserts on appeal (1) that the district court erred in admitting collateral evidence to prove Home's routine practice of breaching contracts; (2) that the record fails to support the legal elements of a claim for tortious interference; (3) that punitive damages were improperly awarded; (4) that Brod's proof of lost profits did not meet the standards of applicable law; and (5) that The Florida Anti-Fencing Act is not applicable.

In Brod's cross-appeal it argues that the district court erred (1) in granting a remittitur of compensatory damages of $450,000 for tortious interference with Brod's employees as having been subsumed in the damages of $960,000 for tortious interference with Brod's agreements with unit owners; (2) in granting a remittitur of punitive damages of $930,000 for tortious interference with Brod's employees as also being subsumed by the award of punitive damages for interference with unit owners; and (3) in applying federal law to determine post-judgment interest rates in a diversity suit.

We conclude that Home's assertions of errors are without merit except as to the assessment of punitive damages and the inapplicability of the Florida anti-fencing law. We agree that as to these issues Home should prevail. We find no merit to the issues posed in Brod's cross-appeal.

As might be expected in a six-week trial with numerous factual issues to be resolved there was a great deal of conflicting evidence. Without detailing the conflicts, a resume of the evidence shows the following: The Lodge is a 280-unit condominium hotel located in Avon, Colorado, developed by Home in 1981. The projected cost of land and buildings was $24 million, and projected sales were $43 million. In late 1980 Home began searching for a management company which would operate the Lodge pursuant to a management agreement with the Homeowners Association (which was controlled by Home until the units were sold) and run its own business as an on-the-premises rental agent offering to rent the Lodge units on behalf of the unit owners.

In searching for a management company, Nixon, who was the project manager of Home, contacted Dennis Brod in Miami, with the result that Dennis Brod and Adler (the two principals of Brod) met with Nixon and Bily and Bennett, the latter two vice-presidents of Home, in Vail, Colorado, in mid November 1980 to discuss a management contract. In December 1980, Nixon signed the first management agreement with Brod, followed by an addendum in early January 1981. This contract was for three years and Brod was to receive $13,000 monthly net income after the Lodge was opened, but in the meantime Brod was to immediately begin pre-opening activities involving substantial work and the expenditure of large sums of money for which it would be rewarded through management fees and rental revenue under its management and unit rental agreements when the Lodge was opened.

Bily and Bennett insisted that they were unaware until June 1981 that Brod was performing under a contract signed by Nix-

on, although Nixon was adamant that they were so informed. By that time Home was having serious problems in selling condominium units because of general economic conditions; Vail realtors had been insulted by Bily; Home had built too many units at one time and had overpriced them. About this time Nixon was accused of falsifying sales and was fired by Home. Home's attorney advised Bily that although the contract entered into by Nixon was not valid because of his lack of authority to bind Home, nevertheless, because of Nixon's apparent authority and the lapse of time, Home might well be liable for its breach. Bily decided to bluff Brod with assertions that the contract was invalid and, finally, Brod agreed to renegotiate it. A final agreement was executed on December 2, 1981, providing for essentially a two-year contract with the same management fee and Brod's agreement to purchase a commercial space in the Lodge (known as C–10) which was the only space to be used by anyone as a rental agent on behalf of the unit owners.

After the Lodge opened on December 1, 1981, with some construction still being completed, there was some evidence that the interior of the Lodge and the outside grounds were consistently dirty and badly maintained. Security and janitorial personnel were poorly instructed concerning their responsibilities. The front desk was disorganized and employees were inadequately supervised. Telephone service was poor, linens, bed pads and towels were inadequate in the rooms, and garbage disposal was on an irregular basis. Snow was not removed from the walkways and parking areas, and the employees were slovenly attired and non-cooperative. Guests at the Lodge complained that there was an accumulation of ice and snow on the walks and driveways, there was no porter service, no record of reservations, the rooms and bathrooms were unclean, and there were insufficient towels. These conditions existed, according to Brod, because Bennett, of Home, refused to approve the hiring of sufficient personnel to take care of these tasks. Moreover, there was difficulty in hiring because of shortage of qualified personnel in the area, and Brod, at its own expense, continually had to clean up the mess created by Home's subcontractors.

Home complained that as required by the management contract Brod failed to secure a bond for its on-site employees to handle the funds for the Homeowners Association, including Adler, who was not bondable. Brod responded that since all checks required Bennett's co-signature, the bonding would have served no useful purpose.

While Home's audit of the Homeowners Association books in February 1982 revealed some deficiencies in the accounting procedures utilized by Brod, Home's auditor reviewed the accounting records for December 1981 and January 1982 and found that Brod had complied with the terms of the management contract.

In the final management contract of December 2, 1981, Brod agreed to purchase the C–10 space for $110,686, and Home agreed to install an access door and make the space fit for occupancy. Because of a dispute between the parties concerning these items, Brod would not close, so Home required Brod to pay $1,700 per month beginning January 1982.

Dennis Brod spent most of his time in Miami while Adler was the active principal at the Lodge. On November 13, 1981, just before the Lodge opened, Brod terminated Adler's employment and brought a suit against him, alleging he had misappropriated company funds. Brod sought a restraining order to keep Adler from contracting with Home and thus eliminating Brod. Brod instructed the general manager of the Lodge not to permit Adler to handle money and to remove Adler from participation in other management activities. Brod notified Home of Adler's termination. Subsequently, Brod made a trip to the Lodge to meet with Adler and resolve the dispute. After December 15, 1981, Adler went back to work at the Lodge on a daily basis. Nonetheless, in the early part of 1982, Adler, without Brod's knowledge, opened a separate account in his own name and deposited the management fees and rental payments in that account, asserting

that this was to protect himself as Brod had not paid him for five or six months. This later resulted in another suit by Brod against Adler for conversion of funds between November 1981 and March 1982.

On February 12, 1982, Home gave Brod notice of its complaints. On March 8, 1982, Home gave Brod notice to vacate the 10–C space. On March 13, 1982, Home gave Brod notice of the termination of the management contract.

On the day Brod was evicted from the 10–C space and its management contract terminated, Home replaced Brod as manager by hiring Richard Gustine to act as temporary Association Manager. Five of the six former rental program employees resigned but stayed on at the Lodge and went to work for Gustine. Subsequently, one of Gustine's companies, Western States Management, Inc., took over the rental program and a management contract with the Homeowners Association was executed by Home with MGM, another company of Gustine and his associates.

By evicting Brod from the 10–C space, Home effectively put Brod out of the rental business. Adler and Brod severed their relationship on March 22, 1982. Dennis Brod never returned to the Lodge after December 30, 1981, and Adler permanently left the Lodge in March 1982.

On appeal Home does not contest the special verdict of the jury finding a breach of the final management contract of December 2, 1981 with Brod and the assessment of compensatory damages in the amount of $157,000.

ADMISSION OF COLLATERAL EVIDENCE TO ESTABLISH HABIT AND ROUTINE PRACTICE

Over the objections of Home, Brod called witnesses Odom and Sierra for the purpose of establishing Home's malicious intentions by showing that Home had a general policy of breaching contracts with small businesses in order to maximize its advantage and profit.

Odom had previously worked for Home for about nine months as a sales consultant and regional vice-president for purchasing. He testified that the policy of Home was to seek employees who were tough-minded, aggressive, no-nonsense business people who, when dealing with housing subcontractors, would hold up the subcontractors' checks to assure completion or improvement of their work. This was consistent with Home's adoption of the Golden Rule— "He who has the gold, makes the rules." Superintendents were required to closely adhere to their budgets and if there was a mistake they were under a great deal of pressure to get it corrected at no further cost to Home. They were told to be a tough bargainer and negative—one who never bends. The purpose of such tactics was not to let mistakes accumulate. Odom had never heard of the Lodge nor had anything to do with it. He never negotiated any contracts for Home.

Sierra worked for Home for about a year and a half as a subcontractor on condominium projects. He testified that Home breached five contracts with him and breached contracts with other contractors. He was subject to unreasonable demands for overtime and did not receive payments for his work when due. At the time he testified, he was engaged in litigation against Home relating to his construction work.

Home contends that the district court committed error by admitting this evidence because both witnesses' limited experience with Home's contracts and the lack of similarity of that experience to the events in issue did not meet the legal standard of adequacy of sampling and uniformity of response. Moreover, it is argued that even if relevant, the probative value of the evidence was substantially outweighed by the danger of undue prejudice.

■ Odom's testimony did not prove a routine practice of Home in breaching contracts. What it did emphasize was a policy of employing aggressive people who would not permit any subcontractors to cut corners or shift their responsibility for mistakes to Home. This policy, while earning the reputation for Home as being a tough subcontractor employer, did not prove that Home engaged in malicious or fraudulent

practices. Even if it was Home's routine practice to carry on its business in this fashion, it falls short of a basis for punitive damages. Thus the error, if any, in this context, did not affect the substantial rights of Home and was harmless. Fed.R. Civ.P. 61, 28 U.S.C. (1982).

■ Sierra's evidence was not relevant on the facts established when it was offered as admissible under the provisions of Federal Rule of Evidence 406. That rule provides in pertinent part that "[e]vidence of the ... routine practice of an organization ... is relevant to prove that the conduct of the organization on a particular occasion was in conformity with the ... routine practice." There is no precise formula for determining when a practice becomes so consistent as to rise to the level of routine, but it is now settled that " 'adequacy of sampling and uniformity of response' are controlling considerations." *Reyes v. Missouri Pacific Railroad,* 589 F.2d 791, 795 (5th Cir.1979) (citing *Notes of Advisory Committee on Proposed Rules,* Fed.R.Evid. 406, 28 U.S.C. A at p. 153).

> It is only when the examples offered to establish such pattern of conduct or habit are "numerous enough to base an inference of systematic conduct" and to establish "one's regular response to a repeated specific situation" or, to use the language of a leading text, where they are "sufficiently regular or the circumstances sufficiently similar to outweigh the danger, if any, of prejudice and confusion," that they are admissible to establish a pattern or habit.

*Wilson v. Volkswagen of America, Inc.,* 561 F.2d 494 (4th Cir.1977) (footnotes omitted) *cert. denied,* 434 U.S. 1020, 98 S.Ct. 744, 54 L.Ed.2d 768 (1978).

■ Sierra's testimony of specific instances of Home's operation within his personal experience, when considered in the light of Home's contractual dealings with thousands of small subcontractors and the significant differences between the types of contracts involved and the course of dealing required of them, falls far short of the adequacy of sampling and uniformity of response which are the controlling considerations governing admissibility. It was, therefore, error for the district court to admit this collateral evidence as evidence of routine practice, but for the reasons that follow the admission of this evidence was not reversible error.

■ Sierra's testimony was cumulative of the testimony of Jones, Senior Vice-President, Marketing of Home's East Houston Division, to which no objection was interposed, in which he stated that because Home did not like the unfavorable provisions in the initial contract entered into by Brod and Nixon, Home would not honor the contract, and Home would go to court if necessary. Further, that it was Home's policy that if it did not like an executory contract that it had signed, because it found a better deal later, Home would merely breach it. Since this evidence was received without objection we cannot say that Sierra's evidence, substantially to the same effect, constituted error.

Finally, it is plain that the evidence of Odom and Sierra was directed solely to the issue of punitive damages. Since we hold *infra* that the evidence on a whole was not sufficient, as a matter of law, to submit the issue of punitive damages to the jury, it follows that the admission of the evidence of Odom and Sierra did not affect the substantial rights of Home, and if erroneous, it was harmless. *See* Fed.R.Civ.P. 61.

Our disposition of this issue makes it unnecessary to consider or decide whether the district court's limiting instructions given before and after the witnesses testified, and in its charge to the jury, were appropriate.

## BROD'S CLAIMS OF TORTIOUS INTERFERENCE

The jury found that Home tortiously interfered with Brod's business relationships with both its employees and the unit owners. Home urges that, as a matter of law, there was no evidence of interference or unjustified interference with Brod's employees or unit owners. Alternatively, Home contends that Brod suffered no damages from tortious interference separate

and apart from its claimed breach of contract damages. We disagree.

It is the settled law in Florida that tortious interference requires proof of each of three elements: (1) The existence of a business relationship under which the plaintiff has legal rights; (2) an intentional and unjustified interference with the relationship by the defendant; and (3) damage to the plaintiff as a result of the tortious interference with the relationship. *Royal Typewriter Co. v. Xerographic Supplies Corp.*, 719 F.2d 1092, 1104–05 (11th Cir. 1983), *Ethyl Corp. v. Balter*, 386 So.2d 1220, 1223 (Fla. 3d DCA 1980) *review denied*, 392 So.2d 1371 (Fla.1981), *cert. denied*, 452 U.S. 955, 101 S.Ct. 3099, 69 L.Ed.2d 965 (1981). Home concedes that there was a business relationship between Brod, its employees and the unit owners, but that since Brod's employee relations were terminable by will, there was no interference by Home because of privileged competition.

In *Unistar Corp. v. Child*, 415 So.2d 733, 734 (Fla. 3d DCA 1982), it was recognized that "[t]he general rule is that an action will lie where a party tortiously interferes with a contract terminable at will." In that case it was pointed out that

> *Wackenhut Corporation v. Maimone*, 389 So.2d 656 (Fla. 4th DCA 1980) and *Lake Gateway Motor Inn, Inc. v. Matt's Sunshine Gift Shops, Inc.*, 361 So.2d 769 (Fla. 4th DCA 1978) *cert. denied* 368 So.2d 1370 (Fla.1979) stand for the rule that a showing of an intentional and unjustified interference with an existing business relationship which causes damage to the plaintiff establishes a prima facie case, and that the burden then shifts to the defendant to justify that interference. If the defendant can prove that the interference was lawful competition—a privilege which the courts recognize when the contract is terminable at will—the defendant will not be found to have committed the tort of unlawful business interference.

*Unistar*, 415 So.2d at 734 (citations omitted).

We entertain no doubt that Brod made a prima facie showing of intentional and unjustified interference by Home with both Brod's employees and the unit owners. Home's attitude and intentions are made clear in a memorandum dated February 9, 1982, from Bily, Division Manager of Home, to Shultz, Senior Vice-President of Operations for Home, in which Bily stated that

> his (Brod's) cash flow and the P & L is negative on the hotel management portion of his operation. We will be in a position when at contract conclusion time we could, by influencing the CIA (condominium management association), to get new management and seeing that a new company was effective in renting units, cut his knees out from under him.

Bily explained that "cut his knees out from under him meant that Home could financially hurt him (Brod) to the extent where he would have to get the hell out of the operation." The result would be that Brod owned a space in the Lodge (C–10) that it paid $110,000 for and no rental program to manage because somehow Home would "cut their knees out from under them on that."

Home did not wait until the conclusion of the contract to carry out the knee amputation operation. Within a month Home gave Brod notice to Vacate the C–10 space and terminated the management contract by notice on March 13, 1982. Two months before this occurred Home had lined up another management company. Gass, who was employed by Brod as manager of the Lodge, was assured by Jones, sales consultant of the Lodge for Home, that should Brod "be placed out of the picture," there would be no problem with his continuing in his position. When this came to pass Gass was told that, for legal reasons, he was to stay away from the Lodge for a few weeks and then come back as manager again. On March 14, 1982, when Brod was evicted from the C–10 space, Bennett, the project manager for Home, told employee Pysz, in an evasive way, that "he couldn't really say to resign because of all of the legal complications but he did say that I would be

taken care of and that I would be introduced to the new management company that would be coming in." All of the front desk personnel resigned at the same time and on the same day, and all were immediately rehired by Richard Gustine, who took over as on-site manager for Home. He had run the car-rental business at the Lodge but had no previous experience in hotel management. Later Gustine got together with Mayes and May, both of whom had some management experience, and incorporated Western States Management and MGM with capital contributions of $500 each, and entered into a management contract for the Lodge with Home. They took possession of and financed the C–10 space through Home to manage the rental unit business. Because Western had no means to finance a marketing program for rentals, Home agreed to, and did put up, $200,000 for that purpose.

■ When Brod's management contract was terminated, and Brod was required to surrender the common space, was locked out and evicted from the C–10 space, Brod had no choice but to give up the rental business. We are therefore unpersuaded by Home's argument that there was no interference with Brod's employees or with the unit owners because Brod abandoned its rental business. Home cannot benefit from its own unlawful actions. Nor need we tarry long to dispose of Home's contention that, under *Ethyl Corp. v. Balter*, 386 So.2d 1220 (Fla. 3d DCA 1980) *petition denied*, 392 So.2d 1371 (Fla. 1981), *cert. denied*, 452 U.S. 955, 101 S.Ct. 3099, 69 L.Ed.2d 965 (1981), since there was no proof that Home acted *solely* out of malice, there can be no claim for tortious interference. *Ethyl* stands for no such proposition. The *Ethyl* court inferred (although it was not called upon to decide the issue) that if the acts complained of were "solely the conception and birth of malicious motives" the interference would be actionable. *Id.* at 1225. This is certainly not to say the converse is true, i.e., that there can be no claim for tortious interference without proof that the defendant acted *solely* out of malice. The significant inquiry to determine the privilege of justification is whether the means employed are not improper. *Nitzberg v. Zalesky*, 370 So.2d 389, 391 (Fla. 3d DCA 1979), *Serafino v. Palm Terrace Apartments, Inc.*, 343 So.2d 851, 852 (Fla. 2d DCA 1976).

■ Home leans heavily on the fact that it had an investment in the Lodge and had a legitimate right to protect its interests and the interests of the unit owners under the condominium declaration. We agree, but the questions remain, were the means to the end employed by Home improper? Was the interference with Brod's employees and the relationships between Brod and the unit owners "sanctioned by the rules of the game"? See *Ins. Field Services v. White & White Inspection*, 384 So.2d 303, 307 (Fla. 5th DCA 1980) (quoting *Grillo v. Board of Realtors*, 91 N.J.Super. 202, 219 A.2d 635 (1966)). As with any start-up operation, especially when construction is still underway, there were some faults to find with Brod's management of the Lodge, but the evidence clearly shows that notwithstanding the expenditure of substantial money and time by Brod and its performance under the contract, Home wanted to rid itself of Brod's business affiliation with the Lodge, not only with respect to its management contract with the Homeowners Association, which it controlled and which was breached for pretextual reasons, but also "seeing that a new company was effective in renting units." To carry out its purpose, Home arranged for Brod's employees to resign and to be employed by Home on the same day and evicted Brod from its exclusive in-house rental space. Home had the burden to establish that its interference was justified. *Wackenhut Corp. v. Maimone*, 389 So.2d 656, 658 (Fla. 4th DCA 1980) *review denied*, 411 So.2d 383 (Fla.1981). This it failed to do.

■ Finally, Home points out that an essential element of a tortious interference claim is proof of damages by the interference, separate and apart from any damage resulting from a breach of contract. *Royal Typewriter Co. v. Xerographic Supplies Corp.*, 719 F.2d 1092, 1106 (11th Cir.1983). Home argues that

the breach of the management contract caused the termination of the rental business and that Brod's damages resulted entirely from the breach of contract. We disagree. The fact that the management contract was breached by Home, that it was suggested that the employees should resign because they would have no jobs and were immediately rehired by Home, and that Brod was locked out of its space, all of which came about contemporaneously, does not militate against the special verdict findings of the jury that, separate and apart from the damages for breach of contract, Brod suffered damages for the tortious interference claims. Rather, these events clearly show that Home was carrying out its plan to get rid of its management contract with Brod, and that separate and apart from this, but at the same time, its plan to take over Brod's employees and to put itself in a position to designate someone else to run the unit rental business, all in one fell swoop. It is clear that aside from the management contract, Brod's business relationships with its employees and with the unit owners were undermined by Home.

## PUNITIVE DAMAGES

The jury awarded Brod punitive damages against Home as follows: For breach of contract, $3,200; for tortious interference with Brod's employees, $930,000; for tortious interference with the unit owners, $1,550,000; for violation of Florida Statutes, Chapter 812, $50,000. The final judgment awarded Brod punitive damages against Home in the amounts of $3,200 on the breach of contract claim, $1,550,000 on the tortious interference claim,[1] and $50,-000 on the Chapter 812 claim.[2]

■ The punitive damages award of $3,200 for breach of contract cannot stand. It is well settled under Florida law that even a "flagrant breach of contract" will not support punitive damages. *Splitt v. Deltona Corp.*, 662 F.2d 1142, 1147 (5th Cir.1981); *American International Land Corporation v. Hanna*, 323 So.2d 567 (Fla. 1975).

■ Brod concedes that, under Florida law, proof of an intentional tort by itself cannot support an award for punitive damages but that there must be an additional showing of malice, moral turpitude, wantonness or willfulness associated with Home's wrongful conduct. "Malice ... is not simply the doing of an unlawful act or injurious act, it implies that the act complained of was conceived in the spirit of mischief or criminal indifference to civil obligations." *Genesis Publications, Inc. v. Goss*, 437 So.2d 169 (Fla. 3d DCA 1983). "The terms 'punitive' and 'vindictive' damages are used interchangeably." *Ellis v. Golconda Corp.*, 352 So.2d 1221, 1225 (Fla. 1st DCA 1977) (citing *Murphy v. Hobbs*, 7 Colo. 541, 5 P. 119 (1884)). Such damages "are recoverable only against defendants whose wrongful conduct is particularly reprehensible." *Schief v. Live Supply, Inc.*, 431 So.2d 602, 603 (Fla. 4th DCA 1983). In *White Construction Co. v. Dupont*, 455 So.2d 1026, 1028 (Fla.1984), the Supreme Court of Florida cited with approval and adopted the standard set forth in *Carraway v. Revell*, 116 So.2d 16 (Fla.1959), in which the court there said that there is an affinity between the degree of negligence necessary to recover punitive damages and that necessary to sustain or warrant a conviction for manslaughter.

■ Home argues that its conduct lacked the requisite malice, moral turpitude and public harm which Florida law requires to award punitive damages. It iterates the same contentions it made with respect to tortious interference, i.e., that it believed that Brod's operation of the Lodge had been inadequate; that because of the dispute between Adler and Brod it was impossible for Brod to continue to manage the Lodge; that it evicted Brod from the C–10 space because of the refusal of Brod to close the deal for the purchase of the

---

1. The district court ordered a remittitur of the $930,000 awarded for interference with Brod's employees which we discuss *infra*.

2. We discuss the inapplicability of this act *infra*.

space; and that Brod's rental employees did not resign because of any act by Home.

On the other side of the coin, it was shown that from December 1980, when the first contract was signed, Brod began to expend substantial time and money to promote and develop the Lodge and that Home had no complaints with Brod's performance until about July 1, 1981, when Home had difficulty, through no fault of Brod, in selling the units. At this time Home disclaimed authority in its representative Nixon to execute the contract and bluffed Brod into negotiations for a new contract, asserting that the existing contract was invalid. In September 1981 another contract was executed which again Home later repudiated. Finally, in December 1981, the final contract was signed.

Completion of construction work lagged, which made Brod's operation of the Lodge difficult. Home was not cooperative in authorizing Brod to employ personnel, confronted Brod with negative responses to operating suggestions and unnecessarily placed obstacles in Brod's attempt at management. The dispute which erupted between G.M. Brod and Adler continued for about two weeks, after which Adler returned to the Lodge, and it was after that that the final contract was signed. Home agreed to make certain improvements in the C–10 space but because of Home's continued refusal to do so, Brod was unwilling to close. Brod's rental employees all resigned and were immediately rehired by Home. Brod's manager resigned and after a short time was rehired by Home.

We are convinced that the evidence supports the jury's findings that Home intentionally and unjustifiedly interfered both with Brod's employees and the unit owners, *Manufacturing Research Corp. v. Greenlee Tool Co.*, 693 F.2d 1037, 1040 (11th Cir.1982), but the evidence does not rise to the level of reckless, malicious or offensive character to support the award of punitive or vindictive damages. There being no legal basis for the award of any punitive damages, the jury award for such damages must be set aside. *White Construction Co. v. Dupont*, 455 So.2d 1026.

## PROOF OF DAMAGES ON TORTIOUS INTERFERENCE CLAIM

The jury awarded Brod $956,000 compensatory damages for Home's tortious interference with the business relationship between Brod and the unit owners of the Lodge. Home asserts that Brod's proof of lost profits was insufficient as a matter of law. It argues that Brod failed to establish a reasonable period of profitability in advance of termination; that Brod projected lost profits on the basis of industry averages which were unrelated to its actual experience at the Lodge; and that any projection of lost profits was so inherently speculative as to be legally impermissible. We disagree.

Home points to the settled law of Florida that "[p]roof of profits for a reasonable time anterior to the breach is required to establish lost profits." *A & P Bakery Supply & Equipment Co. v. Hawatmeh*, 388 So.2d 1071, 1072 (Fla. 3d DCA 1980) (citations omitted). Home then jumps to the erroneous conclusion that since Brod was in business for only three months before its business relationship with the unit owners was tortiously terminated, the period was so short that it cannot be regarded as a reasonable time anterior to the breach. Its reliance on *A & P Bakery* is misplaced. There the plaintiff's business venture was in its inception at the time of the defendant's breach. More closely analogous is *Manufacturing Research Corp. v. Greenlee Tool Co.*, 693 F.2d 1037 (11th Cir.1982) relied upon by the district court, where six months was used for the base period of sales and a one-year period was used to estimate lost sales. The court found that

> [a]lthough the fact that MRC had not been in business long makes it difficult to forecast future sales, it is not impossible. Short base periods for the comparison of sales have been used in other cases where necessary. *See, e.g., Heatransfer Corp. v. Volkswagenerk, A.G.*, 553 F.2d 964, 983 (5th Cir.1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978) (five months); *Me-*

*chanical Wholesale, Inc. v. Universal-Rundle Corp.,* 432 F.2d 228 (5th Cir. 1970)."

*Manufacturing Research,* 693 F.2d at 1042.

In *Mechanical Wholesale* the court stated that "the mere fact that Mechanical was a new business does not automatically exclude its claim for future lost profits.... The fact that such damages are difficult to measure and by their nature are uncertain in amount does not render such damages unrecoverable." *Id.* at 231. The court noted that this is particularly true where a party breaches his contract and seeks to escape liability merely because it is impossible for the other party to state or prove a perfect measure of damages. *Id.* at 231.

Home's defensive assertion that Brod's short-lived business is sufficient to deny it any damages is in direct conflict with the conclusion reached in *Lehrman v. Gulf Oil Corporation,* 464 F.2d 26 at 45 (5th Cir. 1972), *cert. denied,* 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972) where the court emphasized that:

> Particularly is the calculation of damages difficult when the future profits of an enterprise as young as Lehrman's must be determined, since there is no reliable track record to look back on. But uncertainty cannot end the efforts of the federal courts to redress the harm caused proprietors by violations of the freedom of the marketplace. The wrongdoer must bear the risk of the uncertainty in measuring the harm he causes.

(Citations omitted)

■ Home next argues that even if the three months base period was adequate, Brod did not establish with reasonable certainty that it was profitable during that period. Brod's expert witness, Peiken, testified that Brod's net profit for the period was $16,298. Home argues that his calculations did not include in the base period any bills which were received but not paid or revenues due but not collected until after March 15, 1982. Peiken's calculations were based upon the date when the bills were actually paid and the revenues collected during the year 1982, and he was un-

aware of any bills received but unpaid during the base period. Home also faults the calculation of the net profit figure for the base period because it contends that Peiken amortized the pre-opening expenses of $176,000 over a five-year period without applying any of the amortized expense to the base period. While this is true, the projected profit for the remainder of 1982 was decreased by the full $35,000 representing the amortized portion of the pre-opening expenses. Moreover, in the $67,110 of expense during the base period, there was included $35,000 for snow removal which was an expense of the condominium association and was never reimbursed to the rental program account. Counsel for Home cross-examined Peiken vigorously, probing and prying at bases for his conclusions and estimates. He had ample opportunity to discredit Peiken and show the fallacies in his reasoning and testimony. It is not our province to make credibility choices or re-weigh the evidence. The factual disputes concerning profitability of the base period were squarely presented to the jury trying the case.

■ Home next asserts that lost profits must be related to the actual expenses of the business and if projections of lost profits are not based on the company's own business history but on industry averages, then the evidence is inherently speculative. This simply is not the law. *Lehrman v. Gulf Oil Corporation,* 500 F.2d 659, 667 (5th Cir.1974), *cert. denied,* 420 U.S. 929, 95 S.Ct. 1128, 43 L.Ed.2d 400 (1975), teaches that:

> There are two generally recognized methods of proving lost profits: (1) the before and after theory and (2) the yardstick test ... the before and after theory is not easily adaptable to a plaintiff who is driven out of business before he is able to compile an earnings record sufficient to allow estimation of lost profits. Therefore, the yardstick test is sometimes employed. It consists of a study of the profits of business operations that are closely comparable to the plaintiff's. Although allowances can be made for

differences between the firms, the business used as a standard must be as nearly identical to the plaintiff's as possible.

 Brod's expert, Peiken, was a certified public accountant specializing in the hotel and resort industry. His firm developed a publication known as "Trend," (admitted without objection) that the firm had been putting out for quite a number of years. It gathers together data from 900 hotels and motels for the purpose of projections and feasibility studies. Peiken compared the projection data he had put together with Trend to make sure that his projections were not out of line with the industry. He based his profit projections on assumptions of comparable occupancy percentages and rates and expenses for summer and winter. These assumptions were based upon the testimony of Brod's admitted expert, Elias, who was engaged in, and familiar with, hotel operations in the Vail area. He was acknowledged as a highly-qualified and knowledgeable operator and his occupancy projections were very close to those used by Home's expert. The evidence presented by Peiken and Elias under the yardstick theory was both admissible and relevant. Suffice it to say that " 'while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate'. The proof may be indirect and it may include estimates based on assumptions, so long as the assumptions rest on adequate data." *Lehrman v. Gulf Oil Corporation,* 500 F.2d at 668 (footnotes omitted) (citing *Story Parchment Co. v. Paterson Parchment Co.,* 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931); *Terrell v. Household Goods Carriers Bureau,* 494 F.2d 16, 24 (5th Cir.1974); *Hobart Brothers Co. v. Malcom T. Gilliland, Inc.,* 471 F.2d 894, 902 (5th Cir.1973); *Locklin v. Day-Glo Color Corp.,* 429 F.2d 873, 879 (7th Cir.1970), *cert. denied,* 400 U.S. 1020, 91 S.Ct. 584, 27 L.Ed.2d 632; *Herman Schwabe, Inc. v. United Shoe Machinery Corp.,* 297 F.2d 906 (2d Cir.1962), *cert. denied,* 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85).

*Beverage Canners, Inc. v. Cott Corp.,* 372 So.2d 954 (Fla. 3d DCA 1979) and *Royal Typewriter Co. v. Xerographic Supplies Corp.,* 719 F.2d 1092 (11th Cir.1983) relied on by Home are inapposite. In *Beverage Canners* the damages were not too speculative because derived from industry surveys and operating results from another company, but because there was lack of comparability and the figures utilized encompassed too many variables. Moreover, the expert's testimony was patently conjectural and remote and based on documentation that was not in evidence. In *Royal Typewriter* the court found that the lost profits were not established with the requisite certainty because the hypothetical firm used was not sufficiently comparable to the plaintiff's business operations and there was no showing that they ever operated their business in accordance with it. Home's objections concerning the figures and methods employed by Peiken and Elias are the type properly addressed to the jury. The arguments do not afford a basis for setting aside the jury's verdict.

Finally, Home urges that the projection of lost profits was speculative as a matter of law. It attempts to blend the Homeowners Association management contract with Brod's rental contracts with the unit owners and argues that the association could exercise its discretion not to renew the association's agreement when it expired of its terms. Further, Home points to the rift between G.M. Brod and Adler, the effect of a lack of snow, and the dependency of rental revenues on the sale of the Lodge units by Home.

While it was certainly advantageous to Brod to have the management contract and the rental unit agreement both in operation at the same time, they were separate agreements and the loss of the management agreement at the end of its term would not necessarily affect the ability of Brod to continue the rental program with the unit owners. Obviously, in the manner that they were both terminated, it was impossible for Brod to continue in the business of either management or rental of units. The disputes between G.M. Brod

and Adler were resolved and could have had no effect on projections made by Peiken. The lack of sufficient snow and weather conditions are always variables in a ski resort area but they were taken into account in establishing occupancy figures. Finally, rental revenues were not dependent upon the sale of units by Home because the unsold units of Home were made available for renting.

Proof of the amount of damage is less severe than the burden of proving the fact of damage:

> Very often the nature of the wrong makes ascertainment of the damages difficult; but the Supreme Court has emphasized that "[i]n such [a] case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." *Story Parchment Paper Co. v. Paterson Parchment Paper Co.*, 1931, 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544, 548. "[T]he jury may make a just and reasonable estimate of the damage based on relevant data...." In such circumstances "juries are allowed to act on probable and inferential as well as [upon] direct and positive proof." *Bigelow v. RKO Pictures, Inc.*, 1946, 327 U.S. 251, 264, 66 S.Ct. 574, 580, 90 L.Ed. 652, 660.

*Terrell v. Household Goods Carriers Bureau*, 494 F.2d 16, 24 (5th Cir.1974). To the same effect see *Twyman v. Roell*, 123 Fla. 2, 166 So. 215 (1936). It would be a perversion of the fundamental principles of justice "[t]o deny recovery to a businessman who has struggled to establish a business in the face of wrongful conduct by a competitor simply because he never managed to escape from the quicksand of red ink to the dry land of profitable enterprise...." *Lehrman v. Gulf Oil Corporation*, 500 F.2d at 669.

In the present case, the trial court instructed the jury:

> If you should decide an opinion of an expert is not based upon sufficient education and experience; or if you would conclude that the reasons given in support of the opinion are not sound or that the opinion is outweighed by other evidence, then you may disregard the opinion entirely.

We are unpersuaded that we should upset the jury's action. "[W]e cannot find that the jury's findings relating to damages are 'beyond the pale of sane judgment.'" *Terrell v. Household Goods Carriers Bureau*, 494 F.2d at 25 (quoting *Hobart Brothers Co. v. Malcolm T. Gilliland, Inc.*, 471 F.2d 894 (5th Cir.1973)).

## THE FLORIDA ANTI–FENCING ACT (OTHERWISE KNOWN AS THE THEFT STATUTE)

The final judgment awarded Brod $99,000 compensatory damages ($33,000 awarded by the jury and trebled by the court) and $50,000 punitive damages on its claim under the Florida Anti-Fencing Act, Chapter 812, Florida Statutes (1983).

Brod argues that the damages appear to have been calculated to compensate Brod for theft of uncompensated services and expenditures in anticipation of fulfilling the management agreements and that it represents the value of non-contractual services provided by Brod as a result of Brod's reliance upon Home's misrepresentations.

The Act is not as restrictive as its title would indicate, *Roush v. State*, 413 So.2d 15 (Fla.1982). It covers, among other things, conduct previously known as stealing, obtaining money under false pretenses, fraud or deception. Section 812.012(2)(d)1, Florida Statutes (1983). Any person injured by reason of a violation of this provision has a cause of action for threefold the actual damages sustained. Section 812.035(7), Florida Statutes (1983). The imposition of the civil remedies provided by the Act is not dependent upon the adjudication of criminal guilt. *See Roush v. State*, 413 So.2d 15; *Senfeld v. Bank of Nova Scotia Trust Co. (Cayman) Ltd.*, 450 So.2d 1157 (Fla. 3d DCA 1984).

We have searched the record to determine the basis for the award under the Act and we can find no evidence to support the charges against Home that it

was guilty of theft, obtained money for services from Brod by false pretenses, or that it practiced fraud or deception to obtain such services which resulted in damages within the purview of the Act. It is apparent that Brod knew that it would have to expend large sums of money and time for initial consulting and promotional activities before its management contract would permit it to recover all of its money and efforts. Home was unwilling to deal with Brod except on these terms because it wanted a substantial commitment that Brod would do a good pre-opening job. This is precisely why Brod initially insisted upon a three-year contract. The fact that Home later breached the management contract does not negate the understanding of the parties that Brod was expected to spend time and effort and perform services, the reward for which was to be its payment under the management contract.

Brod's claims of fraud and misrepresentations of fact in the inducement of Brod to enter into the first management agreement and to perform services in furtherance of its rental program were found by the jury to have been waived by its execution of the final management agreement. The jury further found that Brod suffered no compensatory or punitive damages as a result of its reliance upon any misrepresentation of fact. All of the services provided by Brod to the Homeowners Association were to be paid for by the monthly management fee. In the face of these findings there is no predicate of theft, false pretenses, fraud or deception for a Chapter 812 violation.

We find no basis for the application of the Act in this case. The $33,000 compensatory damage award is unrelated to any fact in the record. Accordingly, the award for compensatory and punitive damages cannot stand.

## THE REMITTITUR ORDERS

The district court, in its order on post-trial motions, found that there was no evidentiary support for separate awards of compensatory damages for defendant's interference with Brod's relationships with condominium unit owners ($956,000) and with its own employees ($450,000) and that these awards were therefore necessarily duplicative. The court allowed Brod the choice of either accepting a remittitur of the $450,000 award or the election to have a new trial solely on the question of damages for its tortious interference claims. Thereafter, Brod accepted the remittitur and consented to the verdict being reduced in the amount of $450,000 under protest, reserving "its right to such full review of the court's determination in the event the defendant files a notice of appeal...." Subsequently, the district court entered an Order of Clarification in which it held that since the compensatory damage award of $450,000 was included in the award of compensatory damages of $956,000, it followed that the punitive damage award of $930,000 for interference with Brod's employees was likewise subsumed in the punitive damage award of $1,550,000 for interference with Brod's relationships with the unit owners and that "plaintiff's acceptance will be construed to apply to the punitive damage award."

In its cross-appeal Brod argues that it did not accept the remittitur order with respect to punitive damages. Because the court substituted an entirely different remittitur order, Brod submits that its consent to the remittitur of $450,000 compensatory damages was nullified. Brod further contends that since it did not consent to the remittitur of punitive damages we should consider Brod's substantive argument supporting the award of punitive damages for tortious interference with its employees. We disagree.

We have disallowed all punitive damages *supra* so we are not concerned with the punitive aspect of the remittitur orders. We, therefore, deal only with the remittitur of the $450,000 compensatory damage award ordered by the district court and accepted by Brod as the alternative to a new trial on damages. The short answer to Brod's cross-appeal is that it may not appeal or cross-appeal from a remittitur which it accepted. *See Donovan v. Penn Shipping Co.,* 429 U.S. 648, 649, 97 S.Ct. 835, 836, 51 L.Ed.2d 112 (1977); *Richards*

*v. All State Ins. Co.,* 693 F.2d 502 (5th Cir.1982); *Keene v. International Union of Operating Engineers, Local 624,* 569 F.2d 1375 (5th Cir.1978).[3]

## POST JUDGMENT INTEREST RATE

■ The second issue raised by Brod's cross-appeal is its assertion of error that in this diversity suit the district court, in awarding post-judgment interest, applied the federal interest statute, 28 U.S.C. Section 1961 (1982) rather than the Florida interest statute, Section 55.03, Fla.Stat. (1983). The post-judgment interest rate in Florida is 12 percent a year, while the rate applied by the court under the federal statute was 9.59 percent a year.

Brod relies on a line of cases of the former Fifth Circuit decided prior to the effective date of 28 U.S.C. Section 1961 (Oct. 1, 1982), in which the court held that *Erie Railroad Company v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) applied to interest computations in the federal courts and therefore state law dictated the rate of interest pre-, as well as post-judgment. E.g. *Home Life Insurance Co., N.Y. v. Equitable Equipment Co., Inc.,* 694 F.2d 402, 404 (5th Cir.1982). But,

> [f]ederal law now provides for interest from the date of judgment at a floating rate determined by the coupon yield of United States Treasury bills. The provision covers "any judgment in a civil case recovered in a district court." *Id.* No exemption is made for actions based on diversity of citizenship. This court must apply an applicable federal provision over a conflicting state provision, unless the federal provision is found unconstitutional. *See Hanna v. Plumer,* 380 U.S. 460, 471, 85 S.Ct. 1136, 1144, 14 L.Ed.2d 8 (1965); U.S. Const. art. VI, cl. 2. We believe that the new federal interest statute is constitutional and therefore governs the award of post-judgment interest in this case.

*Weitz Co. v. Mo-Kan Carpet, Inc.,* 723 F.2d 1382, 1385, 1386 (8th Cir.1983). *Ac-*

**3.** The dictum to the contrary in *Itel Capital Corp. v. Cups Coal Co.,* 707 F.2d 1253, 1262 (11th Cir.1983) relies on pre-*Donovan* decisions of the Fifth Circuit. Under the rule of *Bonner v. City*

*cord, Schumann v. Levi,* 728 F.2d 1141, 1143 (8th Cir.1984). The district court properly applied the federal interest statute. We find no merit to the issues raised in Brod's cross appeal.

To summarize, we affirm the judgment of $157,000 awarded for the breach of the management contract. We affirm the order of the district court requiring a remittitur of $450,000 for tortious interference of Brod's employees. We affirm the judgment of $956,000 for tortious interference with the unit owners. We reverse the judgment awarding $99,000 compensatory damages under The Florida Anti-Fencing Act. We reverse all of the awards for punitive damages.

AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings not inconsistent with this opinion.

*of Prichard,* 661 F.2d 1206, 1208 (11th Cir.1981), we are bound by *Donovan* and subsequent Fifth Circuit decisions which preclude Brod's cross-appeal.