MAY, J.
The developers appeal an adverse judgment following a jury verdict in a contractor’s claim for lost profits. Multiple issues are raised. We write to address the damages issues. We affirm in part and reverse in part.
In December 1984, American Somax Ventures [ASV] and River Bridge Realty Corporation [RBC] entered into a Selected Builder’s Agreement [SBA] for development of Phase I of a residential development, consisting of approximately five hundred dwellings on five building Pods. Paragraph 11.1 of the SBA provided for the developer to build certain amenities, including a bike path, lighting, electrical services, water and sewer lines, an entrance, gatehouse, wiring for cable television and security, and an amenities building with adjacent pool, tennis and multipurpose facilities, and graphics and signage. RBC agreed to complete the construction and installation of the amenities “as soon as reasonably possible, but in any event ... by no later than the date for such completion set forth in the Contract.” The SBA also required ASV to enter into an Advertising and Promotional Expense Sharing Agreement in which RBC would provide marketing and sales services to ASV in exchange for a 1% commission on sales. The parties executed an Addendum to the SBA, which contained a right of first refusal.[1]
In 1987, RBC sent ASV a “land availability notice,” which would be the first of many, alerting ASV that it was willing to sell the next parcel, Pod 2F. The notice advised that the price and terms were subject to approval by RBC’s board of directors, and asked for a refundable deposit. The notice instructed ASV to sign a waiver of its rights under the Addendum if it did not want to proceed. If the letter was not returned with the deposit within a set time period, RBC would consider it a waiver of ASV’s right of first refusal.
In response, ASV described the notice of availability and request for waiver as a “thinly veiled attempt to anticipatorily breach” the SBA. ASV insisted that RBC was required to tender to ASV any third-party offer to purchase a parcel upon the same terms and conditions. The parties exchanged their respective positions, which remained substantially the same, when each new parcel came up for sale. The ultimate result was that RBC sold the subsequent parcels to third parties.
In 2000, ASV filed a two-count third amended complaint against RBC. The breach of contract claim alleged that RBC sold or contracted to sell parcels in derogation of ASV’s right of first refusal, and that RBC had failed to construct the required amenities. Count II alleged that RBC breached the SBA and Listing Agreement by failing to act in good faith in using reasonably diligent efforts to advertise, market, and promote ASV’s products within the River Bridge development.
At trial, an ASV principal testified that he was given a presentation on the lavish concept and amenities planned for River Bridge prior to entering into the SBA. However, when built, the clubhouse was substantially smaller than anticipated; there was only one unheated pool, two unlit tennis courts, and initially no barbecue pits.
*650 In addition, the principal testified that RBC failed to establish the advertising and promotional program for the development in a timely and professional manner. One of the sales associates testified that the poor amenities led to poor sales. By 1989, tension had developed between the parties, and the exclusive listing agreement was terminated by agreement. RBC in fact instructed their sales staff not to show ASV’s houses because RBC wanted to bring in a new builder.
ASV’s expert, a consultant to real estate developers and builders, testified that the builders were not happy with the sales.[2] His firm was asked to provide advice to increase sales. He also testified that the amenities were woefully inadequate. In his opinion, the 43 homes planned for Parcel 1A should have been sold within 18 months. He found the sales staff “untrained, untalented, unsupervised,” and unable to sell the new homes.
ASV’s expert testified that ASV built and sold 14 homes in their best year even though he opined that it should have sold 30 homes. He then estimated an $11,000 per-unit profit calculation, which he used to determine what ASV would have earned had there been a “proper absorption” rate in Parcel 1A. He arrived at a 7.32% profit rate. RBC objected to the qualifications of the expert and argued that the testimony was too speculative. The trial court overruled the objections.
In calculating lost profits on the subsequent pods, ASV’s expert used the actual sales made by the builders of the subsequent pods to determine the lost profits. He took the number of actual closings and calculated the estimated profit at the 7.32% rate derived from the estimation for Parcel 1A. However on cross-examination, he testified that he did not know whether the other builders ever recognized a profit in the homes sold and did not know the extent of their costs.
The jury ultimately returned a verdict in favor of ASV for $8,573,804. The jury specifically awarded $1,248,817 as damages for the RBC’s failure to build the amenities and properly market the property and the remaining sum for lost profits for each of the parcels subsequently built and sold by other builders in breach of the Right of First Refusal.
RBC argues on appeal that the judgment must be reversed because the expert was not qualified, an incorrect measure of damages was used, and the damages were too speculative. We find that the testimony concerning the lost profits derived from the sale of the remaining parcels was too speculative. We therefore affirm in part and reverse in part.
“When a party seeks lost future profits based upon a breach of contract or other wrong, the party must prove that the lost profits were a direct result of the defendant’s actions and that the amount of the lost profits can be established with reasonable certainty.” Forest’s Mens Shop v. Schmidt, 536 So.2d 334, 336 (Fla. 4th DCA 1988). “Lost profits are generally proven by one of two methods: (1) the ‘before and after theory[1] or (2) the ‘yardstick test.’ ” 4 Corners Ins., Inc. v. Sun Publ’ns. of Fla., Inc., 5 So.3d 780, 783 (Fla. 2d DCA 2009) (citing G.M. Brod & Co. v. U.S. Home Corp., 759 F.2d 1526, 1538 (11th Cir.1985)). “The yardstick test is generally used when a business has not been established long enough to compile an earnings record that would sufficiently demonstrate lost profits” and “compares the profits of businesses ‘that are closely comparable to the plaintiffs.’ ” Id. However, “Host profits must be established *651 with a reasonable degree of certainty and must be a natural consequence of the wrong,” and “[s]uch an award cannot be based upon speculation or conjecture.” Sostchin v. Doll Enters., Inc., 847 So.2d 1123, 1128 (Fla. 3d DCA 2003).
ASV suggests an adequate yardstick was provided by the contractors that built out the subsequent parcels. While those contractors might have provided the trappings of a yardstick, it was not enough to simply assume those contractors were comparable and made a profit; it was necessary to prove both. To do so, it was essential that the actual profit realized be proven or that the profit be determined by subtracting their expenses from their gross sales. It was also essential to establish that those contractors were “closely comparable” to ASV. The expert in this case did neither.
ASV adduced evidence that convinced the jury that its slow sales on the initial pod were attributable to RBC’s breach of its obligations to provide amenities and marketing. It also introduced testimony explaining that its business model, which was typical for large developments, included a large expenditure on the first Pod, with reduced costs for subsequent pods. ASV accounted for estimated costs by applying the estimated 7.32% average per-home profit margin, which its expert testified was below the market average. He then applied that 7.32% profit margin to the gross sales price on the additional pods built by other contractors.
RBC argues that the testimony was speculative because it was based on “the number of houses built by the other home-builders” without “even knowing whether they made a dime of profit.” While ASV’s expert explained how he arrived at his 7.32% profit rate as it applied to Pod 1A, we find the proof lacking as it relates to the pods built by the other contractors. ASV could not establish that the subsequent builders were in the same “start-up” position as ASV, could not prove the subsequent builders’ costs, could not prove that those builders actually made a profit on the subsequent pods, and could not prove that if ASV had been given the opportunity to build out the subsequent parcels, it would have been able to finance the build out and reach the same result as the other builders. This is critical, as times and economies had changed. For these reasons, we find the testimony lacks the reasonable certainty necessary to support the yardstick approach to lost profits, rendering the testimony too speculative to sustain the damages claimed for the future pods.
We therefore affirm in part and reverse in part. We remand the case to the trial court to vacate that part of the judgment that relates to lost profits for the subsequent pods.

Reversed in part and Affirmed in part.

TAYLOR, J. and GARCIA-WOOD, MARINA, Associate Judge, concur.

. The meaning of this provision, and RBC's compliance with it, was hotly contested at trial. RBC also raised evidentiary issues surrounding this provision on appeal. We find no error in the trial court's handling of those evidentiary issues.

. We find no error in the trial court's admission of the expert's testimony.